**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Dean JENKINS, Defendant–Appellant.**

**No. 95–5535.**

United States Court of Appeals, Sixth Circuit.

Argued April 16, 1996.

Decided Aug. 13, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 9, 1996.

---

Michael E. Winck, Asst. U.S. Atty., Office of the U.S. Atty. (argued), Knoxville, TN, Danny R. Smith, Asst. U.S. Atty., Office of the U.S. Atty. (briefed), Johnson City, TN, for plaintiff–appellee.

David B. Hill (argued), Newport, TN, Charles L. Beach, Law Office of Charles Beach & Associates (briefed), Clinton, TN, for defendant–appellant.

Before: MILBURN and BOGGS, Circuit Judges; and BORMAN, District Judge.*

BOGGS, Circuit Judge.

Dean Jenkins alleges ten errors in the way that the federal government investigated, prosecuted, tried, and sentenced him for drug trafficking. Two of these warrant a detailed written opinion. For the reasons that follow, we affirm.

## I

Jenkins owns a trucking company called Black Mountain Motor Lines ("Black Mountain"). Sometime in 1991, Jenkins grew disillusioned with normal profit margins, built a secret compartment into the trailer of a rig, and began to smuggle marijuana from Texas to Tennessee.

Meanwhile, Agent Gilleland of the Tennessee Bureau of Investigation was trying to catch Juan Sepulvada, who Gilleland believed to be responsible for the shipment of significant amounts of marijuana into Tennessee. Gilleland drove to Texas in a false-bottomed truck, posing as a drug buyer. He met Sepulvada and asked to buy marijuana to take back to Tennessee. Sepulvada was generally willing to sell Gilleland marijuana, but was not impressed with Gilleland's false-bottom truck, which Sepulvada believed would not pass an inspection by the authorities. Instead, Sepulvada suggested that they use a more sophisticated container: the secret compartment in the trailer of Jenkins's Black Mountain rig. He told Gilleland that they would have to pay Jenkins $ 150 per pound to transport the marijuana. Gilleland agreed to Sepulvada's tactic and Jenkins's price.

Gilleland notified Agent Escalon of the Texas Department of Safety about the smuggling plan on November 12. The Texas authorities searched the area and located a Black Mountain truck on November 14. By this date, the truck, driven by a Black Mountain employee named James Holt, had already picked up Sepulvada's marijuana. The Texas authorities kept the truck under constant surveillance. Holt drove the truck to pick up a load of carrots in Edinburg, Texas, and, on November 16, began the journey back to Tennessee.

Holt had driven just six miles when he was pulled over by Trooper Lopez of the Texas Highway Patrol. Agent Escalon had instructed Lopez to stop Holt and get consent to search the trailer of the rig for marijuana. Transcript, Suppression Hearing, April 11, 1994, at 35–36. Lopez told Holt that he had stopped him because of a burnt-out tag light. It seems clear from the record, however, that Lopez fibbed. Lopez could not remember telling Holt that a tag light was burnt out, nor could he remember writing Holt a ticket. More important, Holt testified that he had checked his tag lights before leaving Edinburg (perhaps expecting such a ploy), and that all of the lights were operational.

Trooper Lopez and Holt have predictably different accounts of what happened next. Careful reading of the record, however, does leave one with a general picture of what occurred. Lopez gave Holt a written consent form, and asked if Holt would authorize a search of the rig's trailer by signing it. Holt took the form, saying something like: "It's not up to me; I don't own the stuff." Transcript, Suppression Hearing, at 39. Holt then signed the consent form. Although Holt testified that he thought the consent form was only a traffic ticket for a burnt-out tag light, the magistrate judge found this testimony incredible. Lopez, and other officers who arrived later, searched the trailer and found 319 pounds of marijuana hidden behind the carrots.

Jenkins and various codefendants, including Holt, were indicted on December 8, 1993. Jenkins moved to suppress the marijuana seized from his truck. A magistrate judge held a hearing and recommended a holding that (i) Jenkins lacked standing to object to the seizure, and (ii) Holt consented to the search. The district court adopted the magistrate judge's recommendation on August 4, 1994. On November 27, Jenkins filed a motion to dismiss the indictment on grounds of

---

* The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

double jeopardy. On November 30, the day he was scheduled for trial, Jenkins filed a motion to dismiss the indictment for violation of the Speedy Trial Act. The district court denied both motions. Jenkins was eventually convicted, and filed a timely notice of appeal.

We will address two issues. In Part II, we determine whether the court erred in not suppressing the evidence seized after the search of the rig's trailer. In Part III, we determine whether the court erred in denying Jenkins's motion to dismiss the indictment under the Speedy Trial Act. Each of Jenkins's other allegations of error is either frivolous or adequately addressed by the rulings and opinions of the court below.

## II

### A

■ This case gives us an opportunity to clarify an earlier opinion in *United States v. Blanco,* 844 F.2d 344 (6th Cir.1988), concerning the standing of an absentee owner to challenge a search of a vehicle. In *Blanco,* the defendant rented a car, giving both his own name and the name of an "additional driver" on the rental form. The defendant then immediately gave sole control of the car to the driver, who drove from Florida to Ohio with a load of drugs. We held that the defendant in Florida did not have standing to object to a search of the car in Ohio because he did not have a subjective expectation of privacy in the vehicle. *Id.* at 349. *See California v. Ciraolo,* 476 U.S. 207, 210, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate).

The district court apparently read *Blanco* to hold that anyone who entrusts a vehicle to the control of another person cannot have a subjective expectation of privacy in the vehicle. Accordingly, the court held that Jenkins did not have standing to object to the search of the rig because he let his employee, Holt, drive it. We believe that the court's inflexible approach is an incorrect application of the law in this admittedly difficult area. *Blanco* did not establish a per se rule barring any absentee owner from challenging a vehicle

search. It merely affirmed the district court's *factual* determination—reviewing for clear error—that the defendant in *Blanco,* who had merely rented the car for another to drive, did not have a subjective expectation of privacy in a particular vehicle. *Blanco,* 844 F.2d at 349. *Blanco* in no way abrogates a district court's responsibility to consider the evidence that a defendant offers to prove standing. If the facts of a case indicate a subjective expectation of privacy, as they did not in *Blanco,* the first prong of the standing test is satisfied, *see Ciraolo,* 476 U.S. at 210, 106 S.Ct. at 1811, regardless of how far away a defendant-owner may be from his or her vehicle.

■ In the suppression hearing below, Jenkins testified that his employees were not allowed into his rigs' trailers except when loading or unloading freight. Transcript, Suppression Hearing, at 2–3. He also testified that he usually ordered his trailers locked and sealed to guard against shortages and employee theft, although this trailer had inadvertently been left unlocked and unsealed. *Ibid.* We are uncertain if this testimony was credible, or even if there was other information of which we are unaware that would contradict it. But if the testimony is true, it suggests that Jenkins had a subjective expectation of privacy in the trailer of the rig, even if a third party had physical control of the rig at the time of the search. *See United States v. Powell,* 929 F.2d 1190, 1196 (7th Cir.1991) (absentee defendant has standing to object to officer's entry into the canopied back end of his pickup truck); *United States v. Infante–Ruiz,* 13 F.3d 498, 501–02 (1st Cir.1994) (where defendant put a closed briefcase in a friend's car and allowed the friend limited access to it, the defendant "did nothing to indicate [the briefcase's] availability to the public generally nor did his actions betray an intention to forego an owner's normal right to exclude those he wished to exclude"). Because the district court did not address Jenkins's testimony in any manner, we cannot affirm the court's conclusion—based on a simple analogy to factually distinguishable precedent—that Jenkins did not have a subjective expectation of privacy in the rig's trailer.

■ Of course, standing requires more than a subjective expectation of privacy. It also requires that the defendant's expectation be of a type that society recognizes as legitimate. *Minnesota v. Olson,* 495 U.S. 91, 95–97, 110 S.Ct. 1684, 1688–89, 109 L.Ed.2d 85 (1990). Usually, courts apply this part of the standing test by hypothesizing legitimately secret things that could be kept in the searched space. The method depends on the imagination of the lawyers and the court, and both generally have been rather creative. *E.g., Blanco,* 844 F.2d at 350 ("Suppose [the defendant] had been a little old lady from Cincinnati, driving a rental car to Miami with her life savings in cash. If such a person felt nervous about keeping the money in the glove compartment or under a seat, can we say that society would not be prepared to recognize her expectation of privacy if she chose to hide it in a door panel?"). Other circuits have been less willing to suppose that suspicious containers have legitimate functions. *United States v. Lopez,* 761 F.2d 632, 636 (11th Cir.1985) ("A secret compartment constructed within the confines of the hull of the ship is totally unlike a personal dufflebag or footlocker in terms of the uses to which it may be put, and the expectations of exclusive control to which it gives rise. We cannot imagine that society would recognize a reasonable expectation of privacy in the use of 'dead space' in the hull of a ship, sealed with permanent fiberglass and painted to match the surrounding surfaces, for the legitimate storage of personal items.").

■ A rig's trailer is a sealed space without windows. An owner's expectation of privacy in the trailer of a tractor-trailer rig is of a type that society would recognize as legitimate. A rig's trailer is a sealed space without windows. Cf. *United States v. Weatherspoon,* 82 F.3d 697, 699 (6th Cir.1996) (no legitimate expectation of visual privacy in the general interior space of a car because that space is easily viewed from outside). Most of the time, the trailer is locked up against the outside world—and is opened only when it is being loaded or unloaded. In this sealed, locked space, there might be any number of perfectly legitimate items—e.g., personal effects being moved, the posters for a new advertisement campaign, dangerous chemi-cals, tomorrow's newspapers—each benefitting from reasonable secrecy during transport. *See United States v. Doreste,* 947 F.2d 942 (table), 1991 WL 222116 (4th Cir.1991) (unpublished) (per curiam) (absentee owner of tractor-trailer has standing to seek suppression of evidence obtained from search of rig). Nor are we moved by the Eleventh Circuit's distaste for "secret compartments." If the government has concerns about its ability to search such spaces, the proper way to meet those concerns is by tailoring substantive search and seizure law—not by denying a person with an expectation of privacy the right to challenge the search altogether.

Jenkins's standing to object to the search of his trailer becomes all the more important because, under the precedent of at least one circuit, it is unclear if the driver of a rig has standing to object to a search of his boss's property. *United States v. Torres,* 32 F.3d 225, 230 (7th Cir.1994) (driver does not have legitimate expectation of privacy in detached trailer being hauled by truck). *See also United States v. Frazier,* 936 F.2d 262, 265 (one who denies a relationship to the contents of a container does not have standing to object to search of it). Although it is certainly possible for no one to have standing to object to the search of a container (e.g., when the container has been abandoned by everyone), it seems wrong to take standing from Jenkins on the theory that he has given Holt too much control over the rig if Holt himself does not have standing because he has been given too little control.

For these reasons, we cannot affirm the district court's standing ruling on the basis that, even if Jenkins had a subjective expectation of privacy, that expectation was illegitimate.

**B**

After holding that the district court erred in denying a party standing to move for the exclusion of evidence, we would normally remand. However, the district court's admission of the evidence rests on an adequate alternative ground: that the search was reasonable because Holt consented.

A search without a warrant is "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One of those "well-delineated" exceptions is the consent of the person searched. An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973).[1] When one person consents to a search of property owned by another, the consent is valid if "the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (other citations omitted)). For a third party to have "authority" over a space he does not own, the owner must have assumed the risk that the third party would consent to a search:

> [Common authority is] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974). The critical facts, however, are not the actual relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent.

The district court did not address many of Jenkins's important factual allegations concerning the context of Holt's alleged consent. Because we are faced with the question of whether remand is necessary on this issue, we will take the unaddressed factual allegations as true for the moment. Trooper Lopez knew at the time of the search that Holt was hauling a load that did not belong to him. Trooper Lopez also heard Holt say "It's not up to me" in response to Lopez's request that Holt sign the consent form. However, Holt immediately signed the form. Jenkins does not allege that Holt told Lopez that the company had a policy against drivers authorizing searches, nor does he allege that Lopez somehow knew that Black Mountain drivers could not open up the trailer compartment during a run. Further, there was no lock or seal on the trailer door to indicate that the driver was forbidden to open the trailer.

It is obvious that a police officer given certain facts does not have discretion to decide whether these facts are legally sufficient to constitute "authority." *Cf. United States v. Brown,* 961 F.2d 1039 (2d Cir. 1992) ("*Rodriguez* would not validate ... a search premised on an erroneous view of the law."). But an officer does have discretion to interpret the factual implications of words in light of the context in which those words are spoken. The words, "It's not up to me, I don't own the stuff," could have a variety of meanings, depending on the gestures, attitude, and situation of the speaker. As an appellate court, we are too far from the context of the words to recreate the scene adequately—and trying to do so would result in our supplementing the record with our imagination. The most we can ask is if the officer's interpretation of the spoken words was reasonable in light of the contextual information that the record does contain. Approaching the problem in this manner, it was reasonable for Trooper Lopez to interpret Holt's words as simple acquiescence to the request for consent. Nothing Holt said or did would necessarily have put a reason-

**1.** Consent is not valid when it is obtained during an unconstitutional seizure of the person. Although Lopez's stated reason for the traffic stop—the broken tag light—is patently bogus, *see United States v. Ferguson,* 8 F.3d 385 (6th Cir. 1993) (probable cause needed to stop automobile for traffic infraction), the magistrate judge properly held that Lopez's stop was permissible under *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), because Lopez had a reasonable suspicion that Holt was hauling drugs. *See United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir.1993) (permitting *Terry* stop of vehicle and brief detention of driver based upon a reasonable suspicion that driver was transporting drugs).

able officer on notice that Holt did not have the authority to consent to a search of his boss's company's property.

In order to clarify the type of statements to an officer that would be necessary to put the officer on notice of an apparent consenter's lack of authority over a space, it is useful to identify three categories of situations. In the first class of situations, an officer would *never* be justified in believing that the consenter has authority, regardless of what the consenter says. An obvious example is where the officer is aware that the consenter has no rights to the property and no authority to consent, for example, asking the mailman, whom the officer sees delivering a letter, for consent to search a house. Another is where the consenter is obviously only a custodian with limited authority over a particular space, for example, a hotel clerk. *Illinois v. Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801 (an officer cannot reasonably believe that a hotel clerk has authority to consent to search of a guest's room).

In the second set of situations, a reasonable officer would usually think that the consenter does *not* have authority, but the officer could be justified in thinking otherwise if the consenter provides additional information indicating common authority. For example, an officer usually cannot assume that a landlord has authority to consent to search of property used by a tenant, *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), but if the landlord asserts that he stores property or occasionally lives with the tenant, then a reasonable officer may be justified in assuming that the consenter has common authority. *United States v. Yarbrough*, 852 F.2d 1522, 1533–34 (9th Cir.) (landlord stored furniture on property, sometimes slept there, had a spare key), *cert. denied*, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988); *United States v. Hall*, 979 F.2d 77, 79 (6th Cir.1992) (owner of room rented to defendant kept personal property in the room, the room was never locked, and "there was never an agreement or understanding between him and [the defendant] that he was not to go into the room"). In such cases, a simple "yes" to a request to search means "no"; but an elaborate "yes" describing a basis for common authority means "yes." (We do not mean to imply that the consenter's words are the only basis for the additional information that makes "yes" convincing—an officer is justified in relying on his own observations, or believable statements by others, concerning the scope of the consenter's authority over a space.)

In the third category of situations, a reasonable officer would usually assume that a person in the position of the consenter *does* have authority over the space. This is the general rule for people in possession of movable containers, *e.g. Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), or someone who comes to the door of a house after the police knock, *e.g., United States v. Matlock*, 415 U.S. 164, 170–71, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1974). Of course, if the consenter provides additional information, the context may change in such a manner that no reasonable officer would maintain the default assumption. *See United States v. Salinas–Cano*, 959 F.2d 861, 864–65 (10th Cir.1992) (girlfriend cannot consent to search of boyfriend's bag); *United States v. Most*, 876 F.2d 191, 199–200 (D.C.Cir.1989) (store employee cannot consent to search of bag left in his custody by defendant).

One circuit has already held that the consent of the driver of a tractor-trailer rig falls in this third category, *United States v. Gonzalez–Basulto*, 898 F.2d 1011, 1012–13 (5th Cir.1990) (upholding search of tractor-trailer because driver consented with simple "yes"), and we agree. *See also United States v. Mari*, 47 F.3d 782, 783 (6th Cir.1995) (assuming driver has authority to consent to search of truck owned by third party). The generic relationship between the owner of a rig and its driver is characterized by a considerable grant of authority to the driver. The driver has complete control of the tractor part of the rig, and almost always has keys to the trailer. The driver is typically allowed to enter the trailer on the occurrence of any of a certain number of conditions: loading, unloading, an inspection after an ominous noise, or an emergency. Moreover, the driver may actually be the owner of the rig, or someone

with a position in the trucking company that is the practical equivalent of an owner. Therefore, when a driver consents—an act that suggests some authority to consent—a police officer is not required to run down a check list of questions about the details of the driver's relationship to his rig.

One can argue that the ability to enter a space upon the occurrence of a specified event is not the legal equivalent of joint control. Hotel management has the same type of *custodial* access to a hotel room, and there is little doubt that a simple "go ahead, I don't live there" from the manager would be insufficient to justify search of a hotel room. *Illinois v. Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801. However, we believe that the discrepancy in the amount of custodial access necessary to constitute "joint control" in the two situations is acceptable in light of the differences between the trailer of a tractor-trailer rig and a hotel room. A trailer is a moving container sent out onto the highway system, necessarily susceptible to a variety of regulations, weighings, and inspections, and constantly risking discovery by loading, unloading, search, or accident. A hotel room is a residence, however temporary, and our search and seizure law traditionally has protected a person's residence more vigorously than other, more public, places. *See, e.g., United States v. Rem*, 984 F.2d 806, 812 (7th Cir.) ("[T]he privacy interests of people who are in transit on 'public thoroughfares are substantially less than those that attach to fixed dwellings.'") (citations omitted), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993).

For these reasons, we hold that a request to the driver of a rig to search the rig's trailer is firmly within the third of the three categories outlined above. That means that an officer is justified in thinking that the driver has authority to consent unless the officer knows (or is told) other information indicating that the usual assumption is incorrect. On the facts of this case, we do not believe that Holt's quick statement, "It's not up to me; I don't own the stuff"—said while he was signing the consent form—was sufficient to put Trooper Lopez on notice that Holt did not have authority to consent. This is not a case where the driver said: "Sorry, there is a company policy that forbids me from allowing you to search the trailer. Call my boss at 1–800–GOSEARCH." We also note that the absence of a lock-seal on the trailer door further supports the officer's assumption.

Because a reasonable officer in Trooper Lopez's position could have thought Holt had authority to consent to a search of the trailer, the consent validates the otherwise unreasonable search. We therefore affirm the denial of the motion to suppress, even though the district court erred in holding that Jenkins had no standing to bring the motion.

### III

Jenkins also contends that the district court erred in not granting his November 30, 1994, motion to dismiss under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* The Act requires dismissal of a criminal case, with or without prejudice, if the defendant is not tried seventy days after his indictment or the date he first appears in court, whichever date last occurs. *See generally United States v. Mentz*, 840 F.2d 315, 324–26 (6th Cir.1988). Jenkins and the government agree that (i) Jenkins's speedy trial clock began to run on May 27, 1994, when the last of his codefendants appeared in court for the first time, and (ii) Jenkins was tried on November 30, 186 days later.

Once the defendant establishes a prima facie case that the government violated the Act (a simple matter of producing a calendar and showing that more than seventy days have passed since the indictment (or first appearance) and trial has yet to begin), the government has the burden of proving excludable time by a preponderance of the evidence. *Mentz*, 840 F.2d at 326. A court should exclude all the days during which it is waiting to receive information necessary to decide a pending pre-trial motion. If the motion requires a hearing, the entire time from the filing of the motion through the date of the hearing is excludable. 18 U.S.C. § 3161(h)(1)(F). *Henderson v. United States*, 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). *See also id.*, 476 U.S. at

331, 106 S.Ct. at 1877 (court should exclude days during which it is waiting to receive supplemental filings after a hearing). If the motion did not require a hearing, a court should exclude all the days during which it is waiting for filings from the parties. *Ibid.* *Regardless of whether a motion requires a hearing or not,* after the court receives all the information necessary to decide a motion, a maximum of thirty days can be excluded on the theory that the court has taken the matter "under advisement." 18 U.S.C. § 3161(h)(1)(J); *Mentz,* 840 F.2d at 327; *United States v. Moran,* 998 F.2d 1368, 1371 (6th Cir.1993).

■ In its briefs, the government tries to meet its burden to show 116 excludable days by contending that the entire period from April 11, 1994, to November 23, 1994, is excludable because the court was considering a motion by one of Jenkins's codefendant's to use a jury questionnaire. Appellee's Br. at 14–15. The government's position would be correct if the court had scheduled a hearing on this motion for November 23, or if the court was waiting until that date for submissions from the parties necessary to decide the motion. However, nothing in the record indicates that a motion to use a jury questionnaire requires a hearing or additional submissions by the parties. The motion was first brought before the magistrate judge, who deferred to the district court for a ruling on the motion, on April 11. Since no new submissions were required to resolve the motion, only thirty days from the time the district court received the relevant materials from the magistrate are excludable under the Act. These thirty days expired on May 11— and the motion to use a jury questionnaire is therefore irrelevant in deciding how many days after May 11 are excludable.

■ The district court had no better basis for dismissing Jenkins's motion. It cryptically held:

[T]he Court calculated Speedy Trial by including time for a government response to the defendants' motions, time for hearing and preparation of a report and recommendation in regard to various motions by the United States Magistrate Judge, ten days for the parties to object to any report

and recommendation, and the Court would then have a maximum of 30 days to act on the report and recommendation considering any objections thereto. Therefore, Speedy Trial would run on February 5, 1995, considering the aforementioned time frames....

JA 418 (Order, Nov. 30). The court is correct to assert that the ten-day period in which the parties may object to a magistrate's report, as well as the first thirty days in which the court is deciding whether to accept the magistrate judge's report, are excludable. *United States v. Andress,* 943 F.2d 622, 626 (6th Cir.1991). However, at least according to our reading of its docket sheet, the district court decided to adopt the last magistrate judge's report and recommendation relating to Jenkins's case on August 4, 1994. Therefore, the district court's rationale cannot explain the period of time between August 5, 1994, and Jenkins's trial on November 30, 1994. During this period, the district court twice postponed Jenkins's trial, on August 15 and on October 3, without finding the postponement necessary "in the interests of justice" pursuant to 18 U.S.C. § 3161(h)(8). Obviously, neither the government nor the court can now exclude this period on the theory that a delay was necessary for proper resolution of Jenkins's case. *United States v. Crane,* 776 F.2d 600, 606 (6th Cir.1985).

■ Our own calculation, however, does result in (barely) enough excludable days to avoid reversing the district court's denial of Jenkins's motion to dismiss. The period from May 27, when the speedy trial clock began to run, to June 6 is excludable because of a variety of pending matters, including motions to suppress and motions *in limine* made by the defendants. *See* District Court Docket Sheet of October 23, 1995, at 54–55. June 6 itself is excludable because the magistrate issued his last report and recommendation on that date. The ten-day period from June 7 to June 16 is excludable because the parties had ten days to file objections to the magistrate's report, which they did not do. *Andress,* 943 F.2d at 626. The thirty-day period from June 17 to July 17 is excluded because the district court had thirty days

after the ten-day objection period to decide whether or not to adopt the magistrate's report. *Ibid.*

 July 18 is excluded because, on that day, three defendants filed a motion to continue the trial date. The court granted that motion on July 19, which is also excludable. July 20 and 21 are the first and second non-excludable days, as no motion requiring a hearing was pending before the court, and no other motion had been pending before the court for less than thirty days. On July 22, a defendant, Buckner, filed a notice of change of plea and a change of plea hearing was set for August 15. Since a change of plea is a motion requiring a hearing, the entire amount of time between July 22 and August 15 is excludable. *See Mentz,* 840 F.2d at 330–32 (defendant's notice of intent to change plea tolls clock). Therefore, between May 27 and August 15, only two days of the statutory speedy trial period had passed.

 On August 15, Jenkins filed a Motion to Seal a copy of a letter that he sent to the United States Attorney's office relating to "prior bad acts" of a codefendant. Jenkins writes in his brief to this court, without citation, that "the above motion should not toll the running of the time in which the defendant must be tried." Appellant's Br. at 28. Jenkins may be arguing that the motion is simply not important enough to toll the speedy trial clock, but there is no authority for excluding some pretrial motions on the basis that they do not require a significant amount of thought or attention by the court. *See Mentz,* 840 F.2d at 327 n. 25 ("Congress could have attacked the many problems raised by the different varieties of pretrial motions and given separate consideration to them. Wisely, it avoided such a morass and extended the exclusion to 'any pretrial motion,' without distinguishing among them"). The defendant's motion was not granted until November 23. Although the entire period that the district court took to decide the matter is not excludable, the first thirty days clearly are. The Motion to Seal thus results in the exclusion of the thirty days from August 16 to September 15.

From September 16 to October 27, there was no motion requiring a hearing pending before the court and no other pretrial motion had been pending before the court for less than thirty days. Therefore, the 42 days between and including these dates are not excludable under the Speedy Trial Act. Our running total of non-excludable days: 44.

On October 28, either the government or a codefendant (it is unclear on the record) moved to have a codefendant transported to a polygraph facility. The court granted the motion on the same day, and that day is therefore excludable.

From October 29 to November 16, there were no motions requiring a hearing pending before the court and no other pretrial motion had been pending before the court for less than thirty days. Therefore, these 19 days are not excludable under the Speedy Trial Act. Our running total: 63.

On November 17, another defendant filed a notice that he wished to change his plea. The court held a hearing and accepted the new plea on November 21. These dates and the time in between them are excludable.

From November 22 to November 26, no motions had been pending before the court for more than thirty days. These five days are not excludable. On November 27, Jenkins filed a variety of motions, including a Motion to Dismiss Based on Double Jeopardy Grounds. JA 66 (docket item no. 484). The parties do not dispute that there was motion activity on each of the remaining days before trial. Our final total: 68 days.

Because only 68 non-excludable days had expired before Jenkins's trial, it is unnecessary to reverse the trial court's denial of Jenkins's November 30 Motion to Dismiss for Violation of the Speedy Trial Act—despite the inadequacy of the government's or the district court's response to Jenkins's almost-meritorious claim.

## IV

Although the district court made two serious errors concerning the trial of Dean Jenkins, for the reasons discussed above, neither

error affected the outcome of his case. His conviction and sentence are AFFIRMED.