**UNITED STATES of America,**
**Plaintiff,**

v.

**N'Kenley ELMORE, Defendant.**

**No. CR2–01–1281(1).**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 1, 2001.

Mark Thomas D'Alessandro, U.S. Attorney's Office, Columbus, OH, for U.S.

Steven Ray Keller, Columbus, OH, Steve Nolder, Columbus, OH, for N'Kenley Elmore.

## *OPINION AND ORDER*

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on Defendant N'Kenley Elmore's Motion to Suppress Physical Evidence and Motion to Suppress Statements Intercepted by Wiretap. The Government responded to both Motions, and the Defendant replied. A hearing on the Motions was held on October 9 and October 10, 2001. For the following reasons, the Defendant's Motions are **GRANTED.**

### II. FACTS AND PROCEDURAL HISTORY

#### A. Facts

The following facts were adduced at the suppression hearing held on October 9 and 10, 2001.

On June 21, 2001, Logan County Sheriff Deputy Franchie Robinson stopped a 1991 blue Cadillac El Dorado on Route 33 near Zanesfield, Ohio because he did not see a visible license plate on the car. After following the vehicle for approximately one mile and not seeing a rear license, Deputy Robinson turned on his siren and overhead lights to pull the vehicle over, and activated the police cruiser's video camera, which ran throughout the entire stop.

Upon stopping the vehicle on the side of the road, Deputy Robinson noticed a square-shaped tag in the upper right corner of the rear window, but was unable to read any of the numbers on the tag, or see any markings on it because the back window was tinted. As Deputy Robinson walked from his police cruiser to the vehicle, he was able to see that the square shaped tag was a temporary license plate from Illinois. Although the tint of the rear window was dark enough to make reading the temporary tag difficult, at that time, Deputy Robinson believed that the degree of tinting was legal under Ohio law.

Deputy Robinson approached the driver's side of the vehicle, and noticed that there were two men in the car. He spoke to the driver, Orlando Elmore, and told him that he had pulled the car over because he had not seen a rear license, and then asked for Mr. Elmore's driver's license, registration, and insurance, all of which Mr. Elmore gave him. Deputy Robinson then returned to his police car, and called in Mr. Elmore's license to dispatch, asking for a driver's license history check and a criminal history check. Dispatch informed Deputy Robinson that there was conflicting information about Mr. Elmore's driver's license; the record found by Dispatch indicated that Mr. Elmore had a temporary permit to drive with a licensed driver, but the license that Mr. Elmore had given to Deputy Robinson did not indicate that it was temporary. Deputy Robinson waited for more information from Dispatch to try to clarify the discrepancy.

While waiting to hear back from Dispatch, Mr. Elmore stepped out of the car to give Deputy Robinson more information that he thought might help expedite the check on his license. At that point, Deputy Robinson asked Mr. Elmore various questions, including where he and his passenger had driven from, who the passenger was, and where they were going. Mr. Elmore answered that the two men had traveled by bus to Chicago, where he now lives, and that he was now driving the passenger, his brother, back home to Columbus. At the time that Deputy Robinson asked these questions, he did not suspect that either the driver or passenger was engaged in any criminal activity.

Deputy Robinson then went back to the vehicle to speak with the passenger, whom he learned was Tyrone Maynus. He asked Mr. Maynus some of the same questions he had asked Mr. Elmore. Despite the fact that Mr. Maynus provided some conflicting answers, Deputy Robinson still did not believe that either Mr. Elmore or Mr. Maynus was engaged in any criminal activity. At some point during the conversation with Mr. Maynus, however, Deputy Robinson believed he smelled the odor of burned marijuana.

Around the time that Deputy Franchie Robinson was questioning Orlando Elmore, Deputy Tony Robinson arrived on the scene of the traffic stop. Officer Tony Robinson continued speaking with Mr. Elmore while Officer Franchie Robinson was at the car speaking with Mr. Maynus. Because he thought he recognized Mr. Elmore, Officer Tony Robinson asked Mr. Elmore if he had arrested him before, to which Mr. Elmore answered "no."[1] Be-

1. Subsequently, Deputy Tony Robinson discovered that Orlando was not the man that he had thought he was; Orlando was correct

fore Officer Franchie Robinson told Officer Tony Robinson that he thought he smelled marijuana in the car, Officer Tony Robinson asked Mr. Elmore for consent to search the car. After Mr. Elmore gave consent, Officer Tony Robinson asked him if there was either money or narcotics in the car. Mr. Elmore responded that there was a large amount of cash (approximately $10,000) in the trunk of the vehicle, but no drugs.[2] Officer Tony Robinson testified that at the time that he asked for consent to search the car, he had no basis for believing that either Mr. Elmore or Mr. Maynus was engaged in any criminal activity.

Mr. Elmore returned to the car to open the trunk. At that point, Officer Franchie Robinson had finished talking to Mr. Maynus. Officer Franchie Robinson told Officer Tony Robinson that he thought he smelled burned marijuana, and Tony Robinson told Franchie Robinson that they had permission to search the car. Mr. Elmore then opened the trunk, showed the officers where the money was, and the officers removed the money from the vehicle.

After removing the cash from the vehicle, the officers called for additional police assistance. Soon thereafter, Deputy Robert Summers arrived on the scene with a police canine. The dog was placed in the car and alerted to the back rear corner of the back seat of the car, near the side wall. Officer Summers, after failing to find any narcotics on or behind the back seat, got a screwdriver to remove the air vent in the rear door jamb. Once the air vent was removed, Office Summers saw a black panel, which he then pried back. The black panel broke off to reveal a false compartment. Inside the compartment, Officer

Summers found a cellophane container that contained what looked like powder cocaine. Subsequently, when the vehicle was towed to the Logan County Sheriff's Department, a member of the Highway Patrol was able to override the electronic system that controlled the air vents in the car. With the electronic system shut down, the air vents were easily removed, and officers found in compartments behind the air vents what was later determined to be approximately six kilograms of powder cocaine.

After Officer Summers discovered the powder cocaine at the scene of the traffic stop, Mr. Elmore and Mr. Maynus were arrested for possession of approximately six kilograms of suspected cocaine. Mr. Elmore claimed that Defendant N'Kenley Elmore was the intended recipient of the vehicle and the cocaine. Mr. Elmore also stated that Defendant N'Kenley Elmore had provided the money to purchase the vehicle in which the narcotics were found.

Drug Enforcement Agents asked Orlando Elmore if he would be willing to help further the investigation in his case, and Mr. Elmore indicated he would do whatever he could in order to deal with the charges against him. The agents asked him to make a monitored telephone call to Defendant N'Kenley Elmore, and Orlando Elmore agreed. Thereafter, the agents recorded a number of phone conversations between Orlando and N'Kenley Elmore. During their conversations, Orlando Elmore told Defendant N'Kenley Elmore that the vehicle had broken down, and he requested instructions on how to proceed. The Defendant instructed Orlando Elmore to have the car towed to a McDonald's in BelleFontaine, Ohio, where the Defendant would meet Orlando Elmore and Mr. May-

that Officer Tony Robinson had not previously arrested him.

2. Mr. Elmore testified at the suppression hearing that Officer Tony Robinson never asked for consent to search the vehicle, but only asked to see the money.

nus to provide a AAA card for the towing service. Drug Enforcement Agents monitored that parking lot, and after the Defendant had a brief conversation with Orlando Elmore, they arrested Defendant N'Kenley Elmore while he was trying to leave the parking lot.

At the hearing on the Defendant's Motions to Suppress, Orlando Elmore testified that Defendant N'Kenley Elmore provided him with the money to buy the car he was driving on June 21, 2001. He testified that the Defendant had also driven him and Mr. Maynus to the bus station and had given them money for their bus tickets to Chicago and had made the arrangements for them to purchase the Cadillac while in Chicago. He acknowledged that title to the car was in his (Orlando's) name because he was the person physically present when the car was purchased. He stated, however, that the car and title to it were intended to be signed over to the Defendant. He also stated that he was not the person who put the narcotics into the car.

As to the traffic stop itself, Orlando Elmore testified that he did not consent to the search. He stated that he felt "kind of" intimidated by Officer Tony Robinson when he asked to see the money in the car. He said that he felt he could not refuse the police officer's request to look in the car. Furthermore, Orlando Elmore testified that during the traffic stop, he never felt as though he was free to leave.

## B. Procedural History

On July 17, 2001, the Defendant, N'Kenley Elmore, along with Orlando Elmore and Tyrone Maynus, was indicted on one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine. On October 3, 2001, Tyrone Maynus pled guilty to the offense charged. On October 4, 2001, Orlando Elmore also pled guilty. Defendant N'Kenley Elmore entered a plea of not guilty, and on October 9 and 10, 2001, a hearing was held on his Motions to Suppress Physical Evidence and Statements Intercepted by Wiretap.

## III. DISCUSSION

The Defendant requests that the following items from the June 21, 2001 search be suppressed: (1) $16,000 cash; (2) six kilograms of cocaine. Furthermore, the Defendant requests that all statements intercepted by wiretap from the conversations between N'Kenley and Orlando Elmore on June 21, 2001 be suppressed. The Defendant requests that the money and narcotics seized be suppressed because: (1) Officer Franchie Robinson illegally and unreasonably detained Orlando Elmore and Tyrone Maynus after he discovered that a valid temporary license plate was posted in the rear window of the vehicle in which they were stopped; and (2) Orlando Elmore did not give voluntary consent to Officer Tony Robinson to conduct a search of the vehicle. The Defendant requests that the statements intercepted by wiretap, therefore, be suppressed because they were obtained incident to an illegal detention.

### A. Defendant's Ability to Challenge the Search

The threshold issue is whether Defendant N'Kenley Elmore can challenge the search and seizure since he did not own the vehicle nor was he present at the traffic stop. To answer this question, courts are to look at whether the individual attempting to challenge allegedly unlawful police conduct had an expectation of privacy in the area searched that should be protected by the Fourth Amendment. *United States v. Smith,* 263 F.3d 571, 582 (6th Cir.2001).[3] The determination of

---

**3.** The Supreme Court has rejected the concept of "standing" to challenge the validity of

a search and seizure. *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387

whether an individual had a protected expectation of privacy involves a two-part inquiry: (1) whether the individual had an actual, subjective expectation of privacy; and (2) whether that expectation was objectively reasonable. *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)); *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir.2000). The proponent of the motion to suppress evidence bears the burden of proving that his Fourth Amendment rights were violated by the allegedly unlawful search or seizure. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

### 1. Actual Expectation of Privacy

■ Courts may consider a number of factors in determining whether the defendant had a subjective expectation of privacy. First and foremost among those factors is the individual's possessory or proprietary interest in the area searched or the item seized. *United States v. King*, 227 F.3d 732, 744 (6th Cir.2000) (recognizing that, while it is the most obvious of the relevant factors, "a property right alone is not determinative of whether the individual reasonably expected freedom from governmental intrusion") (citation omitted). "Other factors include whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has

exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." *Id.* (citations omitted).

■ The Court finds that Defendant N'Kenley Elmore had an actual expectation of privacy in the vehicle that was searched based on his proprietary interest in the vehicle. Although title to the vehicle was in Orlando Elmore's name, this Court does not view the question of whether a person has a proprietary interest in an automobile as solely determined by the fact of title. Not only did N'Kenley Elmore provide the money for the vehicle to be purchased, but, according to the testimony of Orlando Elmore, he also arranged the details of the vehicle's purchase, and provided the means for Orlando Elmore to travel to Chicago to obtain the vehicle. Furthermore, as he testified, Orlando Elmore understood that although title had to be in his name at the time of purchase because he was physically present for the purchase and the Defendant was not, both the vehicle and title to it were ultimately intended to be signed over to the Defendant. These facts, viewed together, show that N'Kenley Elmore was the putative owner of the vehicle that was the subject of the alleged illegal search, and he had a subjective expectation of privacy in that vehicle.[4]

(1978) (stating that the Court's "long history of insistence that Fourth Amendment rights are personal in nature has already answered many of [the] traditional standing inquiries," and the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing").

4. The Defendant has asserted that the fact that the narcotics that were found in the automobile were hidden in compartments that were nearly impenetrable also shows that

he had a subjective expectation of privacy in the vehicle. The Defendant has proven that the narcotics were, in fact, extremely well hidden, and that whoever put them in the compartments had a reasonable expectation that they would not be subject to governmental intrusion. The Defendant has failed to prove, however, that he personally had sufficient knowledge regarding the compartments or the narcotics therein to provide an independent basis for finding that the Defendant had a subjective expectation of privacy in the vehicle.

The Government has argued that, even if the Defendant does have a proprietary interest in the vehicle, he is unable to challenge the police officers' conduct because he was not present at the time of the search. *See United States v. Blanco*, 844 F.2d 344, 349 (6th Cir.1988). In *Blanco*, the court found that the defendant had no subjective expectation of privacy in the automobile he rented when the defendant did not keep possession of the automobile, he gave his only set of keys to another individual, he had no access to the automobile after he gave away the keys, and he could not exclude others from the automobile. *Id.* The Government's reliance on *Blanco* is misplaced. The Sixth Circuit has held that the ruling in *Blanco* should not be read to establish a bright-line rule that an absentee owner may never establish a sufficient expectation of privacy to challenge a search of his vehicle. *United States v. Jenkins*, 92 F.3d 430, 434 (6th Cir.1996). To the contrary, courts must engage in a fact-intensive inquiry to determine, on a case-by-case basis, whether defendants attempting to challenge police conduct have a legitimate expectation of privacy. *Id.*

The facts here are readily distinguishable from those in *Blanco*. Unlike the defendant in that case, N'Kenley Elmore had not just rented the car that was searched, he had paid for it. Furthermore, although Orlando Elmore had the vehicle and the keys to it at the time of the search, N'Kenley Elmore was intended to have access to, and ownership of, both, as soon as Orlando Elmore brought the vehicle to him. The fact that N'Kenley Elmore made arrangements for someone other than himself to pick up his car does not mean that the Defendant intended to hold out his car or the items therein to the general public. Taken together, the specific facts here support the Court's conclusion that N'Kenley Elmore maintained a subjective expec-

tation of privacy in the vehicle that was the subject of the challenged search.

**2. Reasonableness of the Expectation**

■ A reasonable expectation of privacy has been referred to as one that society is prepared to recognize as legitimate. *Jenkins*, 92 F.3d at 435 (citing *Minnesota v. Olson*, 495 U.S. 91, 95–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)); *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir.1994). "Usually, courts apply this part of the standing test by hypothesizing legitimately secret things that could be kept in the searched space." *Jenkins*, 92 F.3d at 435.

■ The Court finds that an owner's expectation of privacy in a car with tinted windows is of a type that society would recognize as legitimate. Items inside such a car, whether or not they are in compartments within the car, generally are not visible to passersby. There are countless legitimate, legal, yet "secret" things that one might want to keep in one's car (e.g. clothing, electronic equipment, other personal effects) that would benefit from the privacy inside a car with tinted windows. Therefore, the Defendant's subjective expectation of privacy in the vehicle that was searched was objectively reasonable.

Based on the foregoing, the Court finds that Defendant N'Kenley Elmore had a legitimate expectation of privacy in the vehicle that was subject to the allegedly unlawful search. He, therefore, may challenge the search of the automobile and the seizure of the physical evidence therein as a violation of his Fourth Amendment rights.

**B. Legality of Search and Seizure**

■ The exclusionary rule bars the admissibility of any evidence seized in the course of an unconstitutional search. *United States v. Leake*, 95 F.3d 409, 411 (6th Cir.1996) (citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed.

652 (1914)). As an extension of the exclusionary rule, the "fruit of the poisonous tree" doctrine prohibits the admissibility of any evidence discovered, not during the unconstitutional search, but as a result of items or information obtained through such an unconstitutional search. *Id.* (citing *Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). Therefore, this Court must suppress any evidence that is obtained by means of an unconstitutional search, or is discovered, indirectly, by virtue of such a search.

### 1. Detainment After the Initial Stop

■ Once the purpose of an initial traffic stop is over, a motorist cannot be further detained "unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999); *see United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir.2001) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The determination of whether an officer had such a reasonable suspicion at the time of the detention is based on the totality of the circumstances. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (asserting that the officer's suspicion can be reasonable based on all of the facts together, even if some of the facts, viewed on their own, could point to innocent conduct).

It is uncontested that Officer Franchie Robinson had a legitimate basis for initially stopping Orlando Elmore and Mr. Maynus. Ohio law requires every vehicle to display in plain view a valid license plate on the rear of the vehicle. OHIO REV.CODE

§ 4503.21. If the license is temporary, the tag must be displayed in plain view in the rear of the vehicle, either in the rear window or on an external rear surface, and must not be covered by any material that obstructs its visibility. *Id.* Thus, Officer Robinson was justified in initiating a traffic stop when he could not see any tag or license on the rear of the blue Cadillac El Dorado driven by Orlando Elmore.

■ As he pulled up behind the car on the side of the highway, however, Officer Franchie Robinson was able to see a square-shaped tag in the rear window of the car. Furthermore, after he got out of his car and stood next to the vehicle, Officer Robinson was able to discern that the "square shape" in the rear window was, in fact, a temporary Illinois license plate, that appeared to be valid. The Government argues that even after Officer Robinson recognized that a valid temporary license was posted in the rear window of the vehicle, he was justified in continuing with the traffic stop. The government asserts that it was proper for Officer Robinson to pursue a routine traffic stop because he was issuing a citation for improper display of the temporary license because the window tinting on the rear window of the vehicle was a material that obstructed the visibility of the license tag, allegedly in violation of O.R.C. § 4503.21.

The Court finds, however, that as soon as Officer Robinson discerned a temporary license properly displayed in the rear window, the traffic stop should have ended. *See State v. Baumgartner*, 1999 WL 375519 (Ohio App. June 11, 1999); *State v. Jablonski*, 1995 WL 787381 (Ohio App. Sept. 8, 1995). In *Baumgartner*, under circumstances strikingly similar to those here, the defendant moved to suppress all evidence discovered by an officer following an initial traffic stop for failure to display a license tag. *Baumgartner*, 1999 WL

375519 at *1. During the hearing on the motion, the arresting officer testified that, although at first he saw no license plate on the rear of the automobile, he did see a temporary tag inside the lightly, but legally, tinted back window as he walked alongside the vehicle during the initial traffic stop. *Id.* at *2. He testified that no object obstructed the visibility of the temporary tag; rather, the tint, in combination with the dark of night, made it difficult to read the tag. *Id.* The trial court denied the motion to suppress, finding that, although the driver was not violating any license display law, it was proper for the officer to speak to the driver to explain to him why he had pulled him over, and that, therefore, any evidence of criminal activity discovered during the course of that conversation was properly before the court. *Id.* at *3.

The court of appeals reversed the trial court's decision, ruling that the brief detention to give the driver a courtesy explanation of why he was pulled over could not form the basis for the continued detention and search, as the driver should be free to continue on his way without so much as producing a driver's license. *Id.* at *5 (citing *State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237 (1984)). The officer could only have properly continued the roadside detention if, during the brief explanation, he was given new, articulable, reasonable suspicion that the driver was committing a crime. *Id.* at *6 (finding that because the government had not shown that the officer noticed certain facts that led him to believe that the driver was engaged in criminal activity before he asked for the driver's license and registration, he did not have reasonable suspicion to continue with the detention). The court also concluded that, because the state failed to prove that the tint of the rear window violated the tinting regulations under Ohio law, and the tag was otherwise properly posted in the rear window, the driver did not violate any law

based on the fact that the tinting, combined with the darkness, made it difficult to read the license. *Id.* at *8 (ruling that "none of the statutory provisions relating to the display of a temporary tag makes [the driver] responsible to light the area where the tag is displayed so that it will not be obstructed from view during the dark hours of the night and early morning"). The court held that the officer could not have given the driver a ticket for an improperly displayed temporary tag because:

even though the officer intended to advise [the defendant] of an equipment failure for an improperly displayed temporary tag, he did not have a reasonable, articulable suspicion that [the defendant] was engaged in criminal activity; therefore, he had no constitutional justification for the continued detention of [the defendant].

*Id.*

Similarly, in *Jablonski*, the court considered the propriety of an officer's issuing a ticket pursuant to Ohio Rev.Code § 4503.21 for improper display when a temporary license was properly placed in a rear window, but the window was heavily tinted. *Jablonski*, 1995 WL 787381 at *2–3. The court concluded that, because the officers conducting the traffic stop were able to read the numbers on the temporary tag as they approached the vehicle before they spoke to the driver, the officers could not maintain a reasonable suspicion that the vehicle was improperly licensed. *Id.* at *4 (citing *State v. Chatton*, 463 N.E.2d at 1240–41). The court ruled that the driver did not violate Ohio Rev. Code § 4503.21, and should have been free to continue on his way without having to provide any information to the officers. *Id.*

Here, as in *Baumgartner* and *Jablonski*, Officer Franchie Robinson should have al-

lowed Orlando Elmore and Mr. Maynus to continue on their way as soon as he recognized that they displayed a valid temporary Illinois license in the rear window of the vehicle. Officer Robinson testified that he stopped the Cadillac because the license plate was not displayed. At the scene, Officer Robinson did not see the license plate until he was alongside the rear window due to the tint, which he admits he thought to be of a legal degree under Ohio law. Under *Baumgartner* and *Jablonski,* once Officer Robinson saw what appeared to be a valid Illinois temporary license plate, the reason for the detention ended. Officer Robinson could not maintain a reasonable suspicion that the vehicle was improperly licensed. Indeed, once he saw the Illinois plate, Officer Robinson, by his own admission, had no reasonable, articulable suspicion that either Orlando Elmore or Mr. Maynus was engaging in any criminal activity; he had no basis for suspecting drug activity, nor did he have any basis for suspecting a traffic violation.

Based on the foregoing, the Court finds that as soon as Officer Franchie Robinson discovered that a temporary tag was posted in the rear window of the vehicle, free from obstruction, he should have allowed Orlando Elmore and Mr. Maynus to continue on their way. The driver and passenger should have been released before Officer Robinson ever asked for Orlando Elmore's license and registration. Therefore, the continued detention of Orlando Elmore and Mr. Maynus and subsequent search of their vehicle violated their Fourth Amendment rights, and any physical evidence discovered as a result thereof must be suppressed.

### 2. Consent to Search

Once the purpose of an initial traffic stop is completed, the officer cannot further detain the vehicle or its occupants absent articulable suspicion of criminal activity. *Mesa,* 62 F.3d at 162. It does not

necessarily follow, however, that consent given during an illegal detention (i.e. consent given during a detention that continues after the purpose for the initial traffic stop is completed even though the officer lacks a reasonable, articulable suspicion of criminal activity), is necessarily invalid. *United States v. Guimond,* 116 F.3d 166, 170–71 (6th Cir.1997) (rejecting a bright-line rule that would deem any consent given during an illegal detention *per se* invalid).

Validity of consent to search, no matter when it is given, turns on the voluntariness of the consent, which is a factual issue that must be determined in light of the totality of the circumstances. *Id.* at 170 (citing *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). Furthermore, the consent must be unambiguously and intelligently given, free from contamination of duress or coercion. *United States v. Worley,* 193 F.3d 380, 386 (6th Cir.1999) (citing *United States v. Tillman,* 963 F.2d 137, 143 (6th Cir.1992)). In determining the validity of consent, the court should consider a number of factors, including: the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police. *Worley,* 193 F.3d at 386 (citations omitted). The burden of proving that consent was voluntary is on the government. *United States v. Erwin,* 155 F.3d 818, 823 (6th Cir.1998) (citation omitted).

As a threshold matter, Orlando Elmore testified that he did not consent to the search of the vehicle. That testimony is refuted by Officer Tony Robinson, who maintains that Mr. Elmore did give his consent. This Court does not have to rec-

oncile this factual conflict because, as set forth below, the Court resolves the consent issue on different grounds.

■ Assuming, *arguendo*, that Mr. Elmore did consent, the Court concludes that, under the totality of the circumstances test, the government has not proven that Orlando Elmore's alleged consent to search the vehicle was valid. Rather, the Court believes that the coercive nature of the traffic stop negates any consent that might have been given. *See Worley*, 193 F.3d at 386.

In *Worley*, the Sixth Circuit upheld the trial court's ruling that the defendant did not voluntarily consent to a search of his bag even though there was no lengthy detention or interrogation, the officers lacked visible weapons, the encounter occurred in a public place, the parties spoke in a conversational manner, the defendant appeared calm and cooperative, and the defendant's age, intelligence, and education indicated an ability to consent freely. *Worley*, 193 F.3d at 386. The court found that consent was nonetheless involuntary based on the defendant's statement, "You've got the badge, I guess you can [search my bag]," which indicated that he did not freely consent. *Id.*

In addition to the Sixth Circuit's ruling in *Worley*, a survey of other circuits reveals that other courts have deemed consent to have been negated under circumstances similar to those here. *See United States v. Pena–Saiz*, 161 F.3d 1175 (8th Cir.1998); *United States v. Winningham*, 140 F.3d 1328 (10th Cir.1998); *United States v. Washington*, 151 F.3d 1354 (11th Cir.1998). In *Pena–Saiz*, the Eighth Circuit held that the defendant did not voluntarily consent to a pat-down search, despite her statement to narcotics officers to "do what you have to do," when the officers lacked reasonable, articulable suspicion of any criminal activity but nonetheless detained the defendant for twenty minutes, never told her that she was free to leave or that she had a right to refuse to answer their questions, and made statements implying that they had the authority to conduct such a search. *Pena–Saiz*, 161 F.3d at 1177–78. In *Winningham*, the Tenth Circuit found that the defendant's consent to a search of his van was not freely given when officers failed to inform him that he had a right to refuse to consent, and, despite the fact that they exhausted the reasonable suspicion that initially justified the stop, did not tell him that he was free to leave. *Winningham*, 140 F.3d at 1332 (also relying on the fact that the officers had asked the defendant to step out of his vehicle and told him to stand near three armed officers). Similarly, in *Washington*, the Eleventh Circuit concluded that the defendant did not voluntarily consent to a search of his belongings and person when two uniformed federal officers boarded a bus without any reasonable suspicion of criminal activity on board, held their badges over their head, and asked to see the defendant's ticket and identification. *Washington*, 151 F.3d at 1357. The *Washington* court held that, under such circumstances, a reasonable person would not feel that he was either free to leave or free to deny consent. *Id.*

The facts here are notably similar to those in *Worley* and its progeny. First, at no time during the traffic stop did any officer tell Orlando Elmore that he was free to leave, even after the suspicion that gave rise to the initial stop had been exhausted. Second, as a practical matter, Mr. Elmore was unable to leave the scene, as Officer Franchie Robinson retained control of his driver's license and registration throughout the duration of the stop. Had Mr. Elmore attempted to leave the scene without those items, he would have committed a traffic offense. Third, at the time that Orlando Elmore allegedly gave his consent, two uniformed police officers and

two patrol cars with flashing lights were already on the scene for what was supposed to be a routine traffic stop for an obstructed license plate-facts that support Mr. Elmore's statement that he felt intimidated. Indeed, Mr. Elmore testified that he did not believe that he was free to depart, that he felt somewhat intimidated by Officer Tony Robinson, and that he felt as though he had no choice but to give the officers permission to look in the car under those circumstances. Finally, throughout the time that he was detained on the side of the road, no officer ever told Mr. Elmore why the alleged routine traffic stop was taking an excessive amount of time.

The Court finds that, under the totality of the circumstances as set forth above, the consent that Orlando Elmore allegedly gave for officers to search inside the vehicle was not voluntary and, therefore, did not remove the taint of the illegal detention. Thus, any evidence discovered during the continued detention was discovered as part of an unconstitutional search, and must be suppressed.

### C. Statements Intercepted by Wiretap

As discussed above, the fruit of the poisonous tree doctrine requires the suppression of any evidence that is discovered as an indirect result of an unconstitutional search. *See* discussion *supra* Part III.B. Because Officer Franchie Robinson should have released Orlando Elmore and Mr. Maynus upon discovering that they had a valid temporary license posted in plain view in their rear window, and because Orlando Elmore's consent to the search of the vehicle was invalid under the circumstances, the search that was conducted during the stop of the Defendant's car was unconstitutional. Thus, any evidence that was discovered as an indirect result of that search must be suppressed. Because the Drug Enforcement agents would not have been able to obtain the statements intercepted by wiretap during telephone conversations between Orlando Elmore and Defendant N'Kenley Elmore but for the illegal detention and unconstitutional search, those statements must be suppressed as tainted fruit of the poisonous tree.

### IV. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** the Defendant's Motion to Suppress Physical Evidence and the Defendant's Motion to Suppress Statements Intercepted by Wiretap.

**IT IS SO ORDERED.**