*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0227P (6th Cir.)
File Name: 03a0227p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

RICHARD JONES, JR.,
    *Defendant-Appellant.*

No. 01-6036

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00131—James H. Jarvis, District Judge.

Argued: December 12, 2002

Decided and Filed: July 10, 2003

Before: KENNEDY and GILMAN, Circuit Judges;
SARGUS, District Judge.[*]

———————

### COUNSEL

**ARGUED:** James W. Bell, Knoxville, Tennessee, for Appellant. Perry H. Piper, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

———————

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

---

**ON BRIEF:** James W. Bell, Knoxville, Tennessee, for Appellant. David P. Folmar, Jr., ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

    GILMAN, J., delivered the opinion of the court, in which SARGUS, D. J., joined. KENNEDY, J. (pp. 9-12), delivered a separate dissenting opinion.

———————

### OPINION

———————

    RONALD LEE GILMAN, Circuit Judge. Richard Jones, Jr. entered a conditional plea of guilty to possession of more than 50 grams of cocaine base with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and to possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Jones reserved the right to appeal the decision of the district court denying his motion to suppress evidence seized at his residence during a search by federal and state law enforcement authorities.

    On appeal, Jones argues that the entry into his residence was unlawful after he refused a request by law enforcement officers that he voluntarily consent to a search. Jones asserts, as part of this contention, that the two persons on the premises that day never gave the officers permission to enter, and, in any event, that they were without authority to do so. For the reasons set forth below, we agree that the officers lacked lawful authority to enter the residence. We therefore **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

In the summer of 2000, a federal task force composed of agents of the Federal Bureau of Investigation (FBI) and the Bureau of Alcohol, Tobacco and Firearms (ATF), together with officers of the Knoxville Police Department, began surveillance of Jones's residence. Law enforcement officers had obtained information that Jones was residing in Knoxville, Tennessee and was in possession of firearms and drugs. The agents and officers subsequently determined that Jones was wanted on an outstanding federal arrest warrant.

On August 9, 2000, members of the task force pulled Jones over in his car and arrested him on the federal warrant. The arresting officers asked Jones for permission to search his residence, which he refused to give. Jones was then placed in custody and transported to the local police station.

As a result of the surveillance conducted prior to Jones's arrest, the officers knew that two other individuals were at his residence. The officers had observed a male working on a motor vehicle in the driveway and had seen him take off one of the door panels. A second person was observed bringing food and water to dogs that were living at the residence.

FBI Special Agent Steven Fisher testified that, after arresting Jones, he and two Knoxville police officers went back to the residence, even though they had been denied consent to search by Jones. Fisher testified that their purpose was not to seek consent for a search, but instead to determine the identity of the two individuals at the residence. He and the two Knoxville police officers ultimately went to the front door and asked to speak to the occupants. Fisher testified that, had the individual answering the door refused to speak to them, he and the police officers would have left the premises.

Officer Kenneth Gilreath of the Knoxville Police Department knocked on the door, while Fisher waited outside

to ensure that the dogs did not attack. According to Gilreath, James Teasley answered the door. Gilreath identified himself and asked Teasley his identity. After Teasley gave his name, Gilreath asked him his purpose in being there. Teasley advised that he was there to clean up the house. Gilreath then asked if he could come in and talk to Teasley. The district court found that Teasley told the officer that he could come inside the door of the residence. Jones argues, however, that Teasley never gave the officer permission, but simply stepped back from the front door.

After stepping inside the residence, Gilreath observed a second male sitting to his left in the living room. Gilreath began a conversation with the male, who identified himself as Thomas Dickason. Officer Gilreath questioned Dickason about why he was working on the car and removing the door panel. He also asked Dickason about his relationship to Jones. During the course of their conversation, Gilreath recognized prison tattoos on Dickason. Dickason told Gilreath that he had served a prison sentence but was now straight.

He also advised Gilreath that his identification (ID) was in a duffel bag in the back bedroom together with his clothes and tools. Gilreath then asked Dickason for permission to look for the ID in the bedroom. Dickason told Gilreath that he could and pointed to the back bedroom where the duffel bag containing the ID was located.

Gilreath walked to the room and found the duffel bag. While there, he observed a rifle leaning up in the corner of the bedroom and what appeared to be two other firearms and a crossbow. When the duffel bag was opened, Gilreath saw a pipe apparently used to smoke crack cocaine.

The residence was then secured while the officers sought a federal search warrant. Special Agent Steven Fisher submitted an affidavit in conjunction with the application for a search warrant, expressly noting that Jones had denied

permission for a consensual search of the residence. The affidavit further described the interview of Teasley conducted by Officer Gilreath in the foyer of the residence. Fisher further averred that, while in the foyer, the officers observed Dickason. After questioning Dickason, the affidavit noted that Dickason gave Gilreath permission to retrieve his duffel bag from a bedroom that Dickason had occupied the night before.

Jones contends that after he refused consent to search, neither Teasley nor Dickason, both of whom had lesser possessory rights to the premises than Jones, could give lawful consent for the officers to enter the premises. For the reasons set forth below, we agree.

## II.  ANALYSIS

This court reviews the district court's findings of fact in a suppression hearing under the "clearly erroneous" standard, while the district court's conclusions of law are reviewed de novo. *United States v. Pennington*, 328 F.3d 215, 216-17 (6th Cir. 2003). In order to uphold the ruling of the district court that denied Jones's motion to suppress, we must find that Officer Gilreath was lawfully admitted to the residence by Teasley, and also that his subsequent progression through the house once inside was within the bounds of the Fourth Amendment.

As an initial matter, we note that the magistrate judge referred to both Teasley and Dickason as overnight guests throughout his analysis. Dickason admitted that he had slept in the residence, but there is no evidence in the record suggesting that Teasley was anything more than a handyman. Because this factual finding of the magistrate judge was clearly erroneous, we refer to Teasley below as an employee of Jones. Even labeling Teasley as an overnight guest, however, would not change what we conclude is the proper outcome of this case.

The Supreme Court has clearly stated that "the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980) (holding that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest). In addition, a prior decision of this court notes that "the Supreme Court has firmly and repeatedly rejected the proposition that the Fourth Amendment offers no protection against government entry into a home unless the entry is for the purpose of performing a traditional 'search' or 'seizure.'" *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996) (holding that although police officers entered a home for the sole purpose of turning down the stereo, Fourth Amendment protections were triggered). This means that even if we were to accept the contention that Officer Gilreath entered the residence solely for the purpose of continuing his conversation with Teasley, his conduct would not be insulated from Fourth Amendment analysis.

The district court found that Teasley affirmatively gave Gilreath permission to enter the residence. Because we believe that this is a ruling that could have gone either way, it was not clearly erroneous. *Anderson v. Bessemer County*, 470 U.S. 564, 570 (1984) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). We therefore turn to the question of whether Teasley had the authority to give that permission. The question of when an employee's consent is sufficient for entry into a residence has not been treated uniformly by the courts. 3 Wayne R. LaFave, Search and Seizure*: A Treatise on the Fourth Amendment*, §8.6(c) (3d ed. 2002). Some have relied on a theory of agency, while others depend entirely on whether the employee had apparent authority. *Id.* In general, the cases have engaged in a fact-specific analysis of the level of responsibility given to the employee. If the employee's job duties include the granting of access to the premises, authority to consent is more likely to be found. A caretaker left in charge of a home for several

weeks, for example, might have authority to permit entry, while a worker who is present on a more limited basis would not. *Id.*

In this case, Teasley, a handyman, clearly lacked actual authority to permit Officer Gilreath to enter the residence. His authority, even assuming that he had any, would have ceased at the point that Jones denied consent to a search, which had to be understood by Officer Gilreath to include a denial of entry. Although it is true that an employee does in some instances have sufficient authority to consent to entry into or a search of his employer's residence, the lesser, and necessarily derivative, interest of the employee cannot override the greater interest of the owner. When the primary occupant has denied permission to enter and conduct a search, his employee does not have the authority to override that denial. *See United States v. Impink*, 728 F.2d 1228, 1234 (9th Cir. 1984) (stating that "when the police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain"). An individual with an equal interest in the residence, such as a spouse or cotenant, would presumably have such authority, but that is not the case here. LaFave, § 8.6(c).

We next turn to the question of whether any reasonable person would have believed that Teasley had apparent authority to consent to Gilreath's entry into the residence. This court has previously held that "[w]hen one person consents to a search of property owned by another, the consent is valid if the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises. Thus, there is no violation of the Fourth Amendment if, under the totality of the circumstances, the officer performing the search has relied in good faith on a person's apparent authority." *United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003) (internal quotation marks and citations omitted).

Officer Gilreath knew that the individual who opened the door was simply a handyman. This fact, combined with Jones's prior denial of consent to a search, made it impossible for a "man of reasonable caution" to believe that Teasley had the authority to consent to a search of the residence, or even to permit entry. Because Teasley had neither actual nor apparent authority to admit Officer Gilreath to the residence, the warrantless entry was unlawful. This means that all of Officer Gilreath's conversations and discoveries after he entered must be excluded under the "fruit of the poisonous tree" doctrine. *Northrop v. Trippett*, 265 F.3d 372 (6th Cir. 2001) ("[T]he fruit of the poisonous tree doctrine provides that evidence discovered as the indirect result of a Fourth Amendment violation is inadmissible . . . ."). We therefore need not reach the propriety of Officer Gilreath's actions once inside the residence.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

———————

### DISSENT

———————

KENNEDY, Circuit Judge, dissenting. Contrary to the majority, I believe that the facts available to Officer Gilreath at the time he asked permission to step into the foyer of Jones' home were such as to warrant a reasonable belief that Teasley had sufficient authority over the premises to consent to Gilreath's entry for the purpose of continuing the conversation with Teasley, even in light of Jones' prior denial of consent to search the residence. Accordingly, I respectfully dissent.

When reviewing the denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Taylor*, 248 F.3d 506, 511 (6th Cir. 2001). I disagree with the majority that the record supports a finding that Officer Gilreath knew that Teasley was a hired handyman when he knocked on the front door of the house, questioned Teasley briefly, asked to step inside, and Teasley responded "sure" to Gilreath's request to enter.

Officers Gilreath and Kingbury conducted surveillance of Jones' home on the day of, but prior to, Jones' arrest. Gilreath testified that he observed a white male working on a car in Jones' driveway and a black male feeding a couple of dogs on a screened-in back porch. Gilreath testified that the black male he observed could have been Teasley. Gilreath also testified that "[t]here was a lot of activity in and around the house, with people coming and going."

When Agent Fisher asked Jones if he could search Jones' residence, he also asked who was at the residence. According to Fisher, Jones replied that "family members were back at the residence." Fisher then conferred with Officers Gilreath and Kingsbury, who were present at the arrest scene, as to

whether the officers should go to Jones' residence and try to identify some of the people who had been observed at the residence earlier in the day.

When the officers arrived at Jones' residence, Agent Fisher hung back near the street to maintain a clear view toward the back of the residence to protect Officers Gilreath and Kingsbury's safety as they went up and knocked on the door. The officers were concerned about the large dogs, which included some rottweilers, they had seen earlier. Fisher remained in this position for "short period of time" before approaching the front porch himself.

Officer Gilreath testified that a black male responded to his knock on the door. Officer Gilreath's testimony as to the substance of his conversation with the black male is as follows:

> [W]hen he came to the door I identified myself. I showed him my badge and my ID and I asked him who he was. He told me James Teasley and he seemed kind of nervous. I asked him, well, Mr. Teasley, what are you doing here and he said cleaning up. I said, Mr. Teasley, I said, you are a little nervous, you don't have any warrants or anything on you, do you, and he says, well, I don't know. I said, well, either yes or no and he says, I don't know. I said, is that a maybe? He says, maybe. I said, well, can I talk to you for a minute? Can I come in and talk to you? He says, sure. He steps back and I step directly inside the door.

The district court credited Gilreath's testimony that Teasley responded "sure," giving express permission to enter the foyer.

At the moment Officer Gilreath was given permission to enter Jones' dwelling, he knew that Jones had claimed that "family members" were at his home, that Teasley resembled the man Gilreath had observed feeding dogs on the back

porch earlier in the day, and that Teasley, who was standing with a mop and bucket, had explained that he was cleaning up, when asked to explain his presence. Under these circumstances, a reasonably cautious officer could reasonably assume that Teasley was a member of the household[1] and, as such, had the authority to at least consent to Officer Gilreath's entry into the residence for the purpose of completing the conversation. This Circuit has held that in applying the test to determine whether a consent to entry was valid, the actual relationship between the consenter and owner is not critical; rather, it is how the relationship would appear to the officer that is critical. *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). Unless Teasley provided Officer Gilreath with additional information that would have altered the default assumption that the consenter has authority over the property, a reasonable officer may assume that someone who comes to the door after the knock has authority to consent to police entry into the dwelling. *Id.* at 437.

Only Agent Fisher testified that Teasley "was there to clean the house. He was kind of like a hired individual." Officer Gilreath did not testify that Teasley identified himself as a person hired to clean the house or that he otherwise was aware that Teasley was hired help. It is clear that Fisher was not present on the porch when Teasley said he was "cleaning up." Fisher's testimony as to Teasley's employment status should not be credited in determining what Gilreath knew when he acted on Teasley's consent to enter. While Fisher refers to Teasley as a handyman, the basis for this conclusion is not established. Family members also can, and do, "clean up."

The fact that Jones had denied the officers' request to search his residence does not alter the analysis. As the majority observes, an individual with an equal interest in the residence, such as a domestic member of the household, could

---

[1] Jones is black as was the female with him at the time of his arrest.

have the authority to permit the police to enter the residence, despite Jones' prior denial. The majority relies solely on the entry to find that all the evidence obtained after entry, including the proceeds of the search warrant, should be suppressed. Yet the entry was not a search and no observation of criminal conduct was made upon entering. The majority does not contend that Dickason, known to Gilreath as an overnight guest for at least two days, could not consent to the entry of Dickason's bedroom. As an overnight guest, Dickason had authority to permit Gilreath to go the bedroom to get Dickason's identification. There Gilreath observed the gun in plain view, which provided the information used to secure the search warrant.[2] While I agree that Gilreath's entry is not isolated from Fourth Amendment analyses, I would hold that each step of the officers' conduct was reasonable under the circumstances. I would, therefore, affirm the district court order denying the motion to suppress and affirm the conviction.

---

[2] Officer Gilreath recognized the gun as contraband because Jones had just been arrested on an outstanding warrant for possession of a firearm by a convicted felon and, prior to the officer's entry into the bedroom, Dickason had admitted to Gilreath that he had spent time in prison.