**UNITED STATES of America,**
**Plaintiff,**

v.

**Lorena CORRAL, Defendant.**

**No. EP–04–CR–543–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

Oct. 1, 2004.

---

Stephen G. Jurecky, U.S. Attorneys Office, El Paso, TX, for Plaintiff.

Robert R. Harris, Attorney at Law, Daniel Salvador Gonzalez, El Paso, TX, for defendant.

### ORDER GRANTING DEFENDANT LORENA CORRAL'S MOTION TO SUPPRESS

MARTINEZ, District Judge.

On May 21, 2004 and August 2, 2004, the Court conducted evidentiary hearings in connection with Defendant Lorena Corral's ("Corral") "Motion to Suppress" ("Motion") filed in the above-captioned cause. After considering Corral's Motion, the Government's "Amended Response to Defendant's Motion to Suppress Evidence" ("Response"), and the testimony provided on May 21, 2004 and August 2, 2004, the Court concludes that Corral's Motion should be granted, for the reasons set forth below.

### I. FINDINGS OF FACT

In the afternoon on November 19, 2003, Deborah Carrillo ("Carrillo"), a Supervisory Special Agent with the Drug Enforcement Agency ("DEA"),[1] participated in a surveillance operation and search of Corral's home, located at 1808 Jerry Abbott, El Paso, Texas. Several other agents or officers were involved in the operation which was initially prompted by a DEA informant's tip that the home was a "stash house" used for the storage of illegal narcotics. Carrillo and DEA agent Mike Wright ("Wright") conducted an initial "knock and talk"[2] at the home.[3] Before they approached the residence itself, the

---

1. Carrillo has worked with the DEA for nineteen years and has served as a supervisor for approximately two of those nineteen years.

2. "Knock and talk" simply means that the agents approached the residence, knocked on the door, and asked for permission to conduct a narcotics search.

agents surveyed the premises.[4] At some point, the agents witnessed a Hispanic female exit the garage (and presumably re-enter the house). The woman, agents later discovered, was Ernestina Quiroz ("Quiroz"), a Mexican national who was working for Corral as a part-time housekeeper. Shortly after witnessing Quiroz, the agents saw a school bus approach the residence and drop off a young boy. Agents later learned that the boy was Christian Corral, Corral's son, who was a student in the fifth grade.

One of the agents then contacted a Border Patrol canine unit to meet the agents at the residence. Mike Riggin ("Riggin"), a DEA canine handler, ultimately responded to that call. Carrillo and Wright then approached the front outside gate of the residence. Both agents wore black vests that identified themselves as "police", and both were armed and wearing thigh holsters. Off to the side of the front door, and out of sight, stood Riggin with Staffie, a German Shepherd used by the DEA to detect narcotics. Other officers were also stationed around the perimeter of the home. In total, ten officers or agents and one canine[5] were involved in the operation.

A locked security gate separates the residence from the street, and a courtyard area is located between the front security gate and the structure itself. Once at the gate, Carrillo and Wright rang a doorbell that is positioned within reach from the locked security gate. Quiroz opened the front door to the residence (behind the security gate and courtyard area). After Quiroz opened the door, Carrillo identified herself and Wright as DEA agents and asked if they could come in. Quiroz went back into the house and returned with a key to unlock the security gate.[6] At that point, Carrillo and Wright entered the courtyard or foyer area and spoke with Quiroz. The conversation continued in both English and Spanish—as evidenced at the August 2, 2004 hearing, Quiroz's English is limited. Carrillo asked Quiroz if she was the owner of the house, and Quiroz stated she was not the owner. Carrillo then asked Quiroz if she lived on the premises, and Quiroz responded that she did not live there. Apparently, Quiroz indicated that she was there to clean the house, and Carrillo followed up by asking her if she was the maid, to which Quiroz responded affirmatively. Additionally, Carrillo asked Quiroz if she cleaned the house every week, and Quiroz stated that she did. Carrillo next asked Quiroz whether

**3.** Apparently, this was the second "knock and talk" conducted at the premises. In its Response, the Government noted that a similar operation was conducted on May 12, 2003, when DEA agents went to Corral's residence, in part, to inquire as to the whereabouts of suspected drug trafficker Jorge Caballero ("Caballero"). Corral herself allowed DEA agents to search the premises with a canine unit. On that occasion, no illegal narcotics were located, but Corral was taken into custody in connection with unspecified traffic violations. *See* Resp. at 2. The facts surrounding the first "knock and talk" were not developed at either evidentiary hearing in connection with Corral's Motion.

**4.** It is unclear how long the agents surveyed the home prior to approaching the front door, and the evidence does not address whether the agents witnessed Corral herself at the residence, or when departing the residence.

**5.** Quiroz and Christian Corral both testified that more than one dog was involved in the search. The Court credits the testimony of the agents in this regard and finds that only one dog, Staffie, was used in the search of the home.

**6.** Quiroz and Christian testified that Christian let the agents in through the front gate, but the Court credits Carrillo's testimony in this regard, and finds that Quiroz opened the front security gate herself.

she cleaned the "whole" house and whether she washed the clothing. Quiroz responded to both questions in the affirmative. Carrillo also asked Quiroz if she was "in charge" of the boy (referring to Christian), and Quiroz indicated that she was. Finally, Carrillo asked if any other adults were inside the home, and Quiroz stated that there were not.

At that point, Carrillo informed Quiroz that the agents had received information that narcotics were in the house and that they wanted to search the residence, and Quiroz consented to the search. Carrillo also asked Quiroz if she would sign a "Consent to Search" form that had already been completed by Wright. Quiroz signed the form and the agents entered the residence.

After Quiroz gave the agents permission to search the premises, Riggin entered the house with Staffie, and swept from one side of the structure to the other. Riggin and Staffie entered a den or spare bedroom [7], and Staffie reacted, indicating that she detected the odor of narcotics. Staffie first "alerted" to the area immediately surrounding a sofa, then proceeded directly to a closed door leading into a walk-in closet. Riggin opened the closet door, and Staffie pressed her nose into a pile of clothing. Riggin moved the clothing aside and uncovered an open black gym bag filled with packages wrapped with black tape.

Wright then informed Carrillo that Riggin and Staffie had located narcotics. Carrillo proceeded to the den where the drugs were located and saw the open black gym bag filled with wrapped bundles. The bundles apparently resembled other packaged narcotics that had been previously seized from a different DEA investigation. Carrillo instructed the agents to stop the search so that a warrant could be procured

that would allow the agents to search for other items in the home.

Carrillo then spent some period of time in the living room with Quiroz and Christian, and also asked Quiroz to prepare dinner for Christian. While Carrillo was inside the home (thus, after Quiroz consented to the search and apparently after the contraband was located), Carrillo spoke with Quiroz about her duties at the Corral residence and asked her various questions relating to those duties. Quiroz stated that she cleaned the house, cooked and fed the children dinner, washed the laundry, and took out the garbage. According to Carrillo, Quiroz did *not* indicate that she put the laundry away after she washed it. Carrillo asked Quiroz if she was supposed to "care" for the children, and Quiroz stated that she was. Carrillo also asked her if she cleaned the whole house, and Quiroz stated that she did. Carrillo also asked her if there were any areas that she did not clean, and Quiroz responded in the negative. Carrillo asked Quiroz if there was anywhere in the house she was prohibited from entering, and Quiroz stated that she was not prohibited from any particular part of the house. Quiroz also indicated that Corral owned the house and was merely at the store during the search. Based on this statement, the agents believed that Corral was simply at the store. None of the evidence indicated, much less suggested, that Quiroz had permission to let anyone into the home and none of the evidence suggested that she had ever let anyone into the residence on any other occasion.

At the time of the search, Quiroz had worked for Corral for approximately two months. Quiroz did not live with Corral and only cleaned the home approximately

---

7. The room in question was referred to as a den, a spare bedroom, and a weight room.

For simplicity, the Court will simply identify the room as a den.

two days each week. On the days that Quiroz worked for Corral, Corral would generally pick Quiroz up from a friend's house and bring her to the Jerry Abbott home. On the day of the search, Corral picked up Quiroz and brought her back to the home at approximately noon. Apparently, Corral would usually provide Quiroz with instructions on where and what to clean, and Corral's express instructions defined Quiroz's activity in the home. Quiroz was never told to stay out of certain rooms, but Quiroz also indicated that she would only straighten up those rooms that she was instructed to clean. For example, Quiroz testified that she only vacuumed the den where the drugs were located. Quiroz also stated that she did wash the laundry but did not fold the clothing afterward; rather, she simply left it in an ironing room. Corral normally instructs Quiroz to clean the bathrooms first, and, on the day of the search, Corral instructed her in this same manner. Quiroz had just started cleaning the bathrooms when the agents rang the doorbell. Quiroz also testified that she is not ultimately responsible for Christian, and that he contacts his aunt, Gloria, if he wants to do something. In other words, she testified that she was never employed as a childcare provider to look after and supervise Christian.

In addition to speaking to Quiroz, Carrillo also spoke with Christian, and Christian told Carrillo that his mother, brother, and father lived in the house with him and also told Carrillo that his mother, brother, and father were on vacation. When Carrillo asked Christian if he was referring to his real father, he responded by stating that he was referring to his stepfather, Jorge (apparently referring to Caballero).

At approximately 4:00 p.m., Corral called the residence, which was about the same time that Wright left the premises to obtain a search warrant. Carrillo spoke to Corral, informed her that they located marijuana on the premises, and stated that Corral should come home. Corral stated that she was on the freeway and would be there right away, but she never arrived. Wright did eventually obtain a warrant for the premises and the agents conducted a more detailed search of the home. Eventually, Christian's aunt, a woman named Gloria, came to retrieve him. Before he left with Gloria, Christian himself gathered some of his clothing from the den where the drugs were found.[8]

Prior to her arrest in February 2004, Corral resided at 1808 Jerry Abbott, El Paso, Texas, with her two sons, Cesar and Christian Corral. Corral's sister apparently holds title to the Jerry Abbott home, but Corral lived there for a total of seventeen years. Occasionally, Caballero, Corral's purported boyfriend, stayed at the residence, and he last stayed there at some point in November 2003.[9]

Corral also testified that she had regular access to the den where the drugs were found. She states that she would enter the den, clean it, and store things there. Corral noted that her children did not go into the den often, but did on occasion. The den has its own bathroom, which Corral and her children would sometimes use. Men's hygiene products were located in the bathroom connected to the den, and Corral stated that her son sometimes shaves there. She also stated that she stores clothing in that room and that such clothing belongs to her and her sons. Cor-

---

8. Christian testified that he retrieved his clothing from his own room, not the room where the drugs were located, but the Court credits Carrillo's testimony in this regard.

9. It is unclear whether "stayed" means that Caballero resided at the home or whether he simply spent time there.

ral does not pay rent to reside at the home, and documentary evidence reflecting that Corral's brother-in-law owns the home apparently exists.

## II. ANALYSIS

In order to resolve Corral's Motion, the Court must first determine whether Corral has standing to challenge the search. The Court must then assess whether Quiroz had the authority, either actual or apparent, to consent to the search.

### A. Does Corral Have Standing to Seek Suppression?

■ Fourth Amendment rights are personal in nature and, as such, may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citations omitted). A defendant may seek the protections and benefits of the exclusionary rule only if her own Fourth Amendment rights have been violated. *Id.* at 134, 99 S.Ct. 421 (citations omitted). In order to suppress illegally seized evidence, a defendant must establish standing to challenge the search and may do so by demonstrating that she has a legitimate expectation of privacy in the area searched. *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir.1991) (citations omitted). Whether a defendant has a legitimate expectation of privacy involves several factors, including "whether the defendant has a possessory interest in the thing seized or the place searched, whether [s]he has the right to exclude others from that place, whether [s]he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether [s]he took normal precautions to maintain privacy and whether [s]he was legitimately on the premises." *Id.* at 960 (citations omitted); *see also United States v. Thomas*, 120 F.3d 564, 571 (5th Cir.1997) (stating a defendant must show "an actual, subjective expectation of privacy with respect to the place searched or things seized" and "that the expectation is such that society would recognize it as reasonable" (citation omitted)).

■ At the hearing on Corral's Motion, Corral herself testified that she has lived at the Jerry Abbott residence for seventeen years, and, at the time of the search, she resided there with her two sons, Cesar and Christian. The Jerry Abbott residence is her home and has been for some time, and the fact that she does not hold actual title to the residence does not necessarily deprive her of an expectation of privacy in the home. *U.S. v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (holding that property ownership is "neither the beginning nor the end" of the expectation of privacy inquiry). Corral was the primary (and likely only) adult resident of the premises when the search was conducted and had resided there for nearly two decades. As such, she would have a right to use and enjoy the property, as well as the right to exclude others from the premises. With these facts in mind, it is reasonable for Corral to maintain a subjective expectation of privacy in the residence itself.

The room where the drugs were located is a den, and nothing indicates that the room was used as a bedroom by any particular individual. Corral stated that she and her sons sometimes used the bathroom connected to that room, and Corral also testified that she stored some of her own clothing in the closet where the narcotics were located. The Government attempted to suggest that the room was occupied by Caballero, but the evidence in support of this contention is tenuous. The only basis for such a conclusion would be the presence of men's toiletries in the bathroom, but nothing establishes that these toiletries, in fact, belonged to Ca-

ballero. In fact, the evidence suggests that these items may have belonged to Corral's eldest son, Cesar, who is sixteen years old. Indeed, Corral testified that her son would sometimes shave in the bathroom connected to the den.

Based on the evidence, the Court believes that Corral not only has standing to challenge the search of the home itself, but also the den where the drugs were located. Corral had a possessory interest in the residence, as well as the den itself. To reiterate, she was the primary adult resident living at the home, and none of the evidence supports a conclusion otherwise. As the primary adult resident, she would enjoy the right to exclude others from the premises. Finally, she also has a reasonable expectation of privacy in the room and closet that the agents searched.

### B. Was the Search Proper?

■ The Fourth Amendment to the U.S. Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The underlying purpose of the Fourth Amendment is to protect and shield citizens from unwarranted intrusions into their private domain. One has a reasonable expectation of privacy in the sanctuary of his home and is entitled to Fourth Amendment protection. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). In no uncer-

tain terms, the Supreme Court has instructed that the "Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Kirkpatrick v. Butler,* 870 F.2d 276, 281 (5th Cir.1989) (citation omitted).

■ "Simply put, warrantless searches are *per se* unreasonable, and therefore unconstitutional, unless they fall into one of the few specifically established and well-defined exceptions to the general rule." *United States v. Jenkins,* 46 F.3d 447, 451 (5th Cir.1995) (citation omitted). Valid consent is one of the exceptions to the warrant requirement; therefore, a warrantless search violates no Fourth Amendment right or protection if conducted pursuant to valid consent. *Id.* (citation omitted). "[T]he Supreme Court has held that the Fourth Amendment does not have to be waived through a 'knowing and intelligent waiver by the person asserting the right.'" *Id.* at 454. Thus, a third party may provide valid consent to a warrantless search under certain circumstances.

■■ "When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained from a third party, rather than from the person whose property was searched or seized, the government bears the burden of proving that the third party had *either* actual or apparent authority to consent." *United States v. Gonzales,* 121 F.3d 928, 938 (5th Cir.1997) (citing *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)) (emphasis added). "To establish that a third party had actual authority to consent, the government must demonstrate 'mutual use of the property by persons generally having joint access or control for most purposes.'" *Id.* (citing *United States v. Matlock,* 415 U.S. 164,

171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). "To establish that a third party had apparent authority to consent, however, the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent." *Id.* (citing *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). Ultimately, "the validity of a search grounded in third-party consent requires an intensely fact-specific inquiry, and that slight variations in the facts may cause the results to vary." *United States v. Shelton,* 337 F.3d 529, 535 (5th Cir. 2003).

### 1. Did Quiroz Possess Actual Authority?

■ As stated above, "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (citations omitted). Common authority is defined as the "mutual use of the property by those generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk" that a search of common areas might be permitted. *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988.

The common authority doctrine espoused in *Matlock* has justified warrantless searches conducted pursuant to third party consent in a variety of circumstances, including situations where employees have offered consent to a warrantless search.[10] In *Jenkins,* defendant Jenkins was charged with racketeering and interstate shipment of obscene materials via a common carrier. 46 F.3d at 448. FBI agents conducted an investigation into Jenkins who owned and operated a company that managed various adult bookstores that included adult video arcades. Jenkins employed one individual, Mark Boyd, in Memphis, Tennessee to retrieve shipments of adult videos and install those videos at various video arcade locations. *Id.* at 450–51. FBI agents contacted Boyd and obtained his cooperation in their investigation. Boyd continued retrieving the adult video shipments

---

10. Cases involving a third-party's consent to search often times involves consent provided by a spouse or co-tenant or other co-inhabitant. *See, e.g., Shelton,* 337 F.3d at 536–38 (holding defendant Shelton's estranged spouse, Cheryl, had authority to consent although the couple had already separated and Cheryl had moved to another location, because Cheryl had unlimited access to Shelton's residence); *United States v. Rith,* 164 F.3d 1323, 1331 (10th Cir.1999) (holding eighteen-year old defendant Rith's parents had authority to permit a search of his bedroom, because his parents had control over the entire home and could have accessed the room without consent); *United States v. Evans,* 27 F.3d 1219, 1230 (7th Cir.1994) (holding defendant Evans' father had authority to consent to a search of a garage on the father's property which Evans used for an auto repair shop because the father had unrestricted access to the garage); *United States v. Richard,* 994 F.2d 244, 250 (5th Cir.1993) (holding defendant Da Costa's girlfriend, Susan Collymore, had authority to consent to a search of a hotel room because Da Costa and Collymore had shared the room for several days, and both had clothing and personal items in the room); *United States v. Smith,* 930 F.2d 1081, 1085 (5th Cir.1991) (holding defendant Smith's estranged wife, Shyane, had the authority to consent to a search of the defendant's residence based on the fact that Shyane was a co-lessee of the residence and had joint control over the premises).

as he was employed to do, but provided FBI agents with copies of those videos. Ultimately, the Fifth Circuit held that Boyd did have the authority to consent to a search of the items shipped. It found that Boyd was Jenkins' sole employee in Memphis, and "he was the intended recipient of the packages shipped." Furthermore, "he was authorized to open the packages, he was authorized to extract the videotapes, he had sufficient dominion and control over the packages that he could pick them up and carry them away and the agent's testimony indicates that he had, at a minimum, apparent authority to view the videotapes." *Id.* at 455. "Boyd was the only person in Memphis with the foregoing authority over the videotapes." *Id.* The Court noted that, because Boyd was "vested [with] possession and almost absolute control" of the tapes, the defendants "assumed the risk that Boyd would engage in unauthorized conduct with the videos." *Id.* at 456. Accordingly, Boyd had actual authority to consent to the search.

In *United States v. Jones,* a recent Sixth Circuit opinion, the Court addressed the issue of an employee's consent to a warrantless search. 335 F.3d 527 (6th Cir. 2003). The Court noted that the "question of when an employee's consent is sufficient for entry into a residence has not been treated uniformly by the courts." *Id.* at 531 (citing 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 8.6(c) (3d ed.2002)). The Court also noted that the propriety of an employee's consent generally involves a fact-specific inquiry of the level of responsibility given to the employee. *Id.* This mirrors the Fifth Circuit's similar statement set forth in *Shelton.* The *Jones* Court continued by stating that "[i]f the employee's job duties include the granting of access to the premises, authority to consent is more likely to be found. A caretaker left in

charge of a home for several weeks, for example, might have authority to permit entry, while a worker who is present on a more limited basis would not." *Id.* In *Jones,* James Teasley, a handyman working for defendant Jones, consented to a search of Jones' residence. The Court ultimately concluded that Teasley lacked the authority to consent to the search. The Court's conclusion rested on two primary findings: (1) defendant Jones had already denied the officer permission to search and (2) the officer knew that Teasley was simply a handyman and lacked authority to consent to the search. When the officer approached the residence, Teasley opened the door and, in response to the officer's questioning, stated that he was "there to clean up the house." *Id.* at 529. The Court noted that Teasley was simply a handyman and "clearly lacked actual authority to permit" the officer to enter the residence. *Id.* at 531. Based on this finding, the Court reversed the district court's decision to deny the defendant's motion to suppress.

■ Regardless of the context, the cases dealing with third party consent to warrantless searches affirm the notion that mutual use, joint access or control, or some other meaningful connection to the property searched is key to establishing the common authority required for valid consent to a warrantless search.

■ Based on the evidence provided at the hearings on this matter, the Court cannot conclude that Quiroz possessed actual authority to consent to the warrantless search of Corral's home. The evidence does not establish that Quiroz enjoyed a mutual use of the property or that she had either joint access to or control over the property for most purposes. On the contrary, Quiroz enjoyed only limited access to the residence and

was present for specific and limited purposes only. At the time of the search, Quiroz had only worked for Corral for a couple of months, at most, and would clean Corral's house once or twice a week. Quiroz never resided at the Jerry Abbott residence, and none of the evidence establishes that she had unfettered access to the home. Furthermore, the Government submitted evidence showing that, generally, Corral picked up Quiroz from a friend's house and then drove her to the residence to perform her part-time domestic work duties. None of the evidence suggests that Quiroz could arrive at Corral's house as she pleased. Quiroz did not have a key to the home and nothing suggests that her access to the residence was anything but limited to a few hours once or twice a week when she would clean the house and perform other defined domestic duties. Furthermore, nothing suggests that Quiroz ever let others access the home on other occasions or that she, at any time, had permission to do so.

The evidence establishes that Quiroz's limited presence at Corral's home was only in connection with her role as a part-time domestic employee. In other words, she was only present at Corral's home when she was there to work. Quiroz's testimony established that Corral provided her with instructions on where and what to clean when Quiroz arrived at the residence. Thus, Quiroz's access to the premises was defined by Corral herself. Even assuming that Quiroz subjectively believed that she could clean the entirety of the premises, nothing indicates that such access was permitted beyond her normal housekeeping duties, and her "use" of the property (assuming "use" is a proper description) was for specific, limited purposes, not akin to the cases where common authority was found to exist. *See, e.g., Shelton,* 337 F.3d at 536–37 (finding an estranged wife's un-

limited access to a home was a sufficient basis for authority to consent to a search and provide evidence to agents); *Jenkins,* 46 F.3d at 456 (finding an employee's possession and almost absolute control over property was a sufficient basis for authority to consent to a search). Although Quiroz testified that she was never expressly prohibited from certain areas of the home, the evidence fails to show that she actually had permission to access all parts of the home, as the Government would have the Court conclude. Rather, it appears that Corral would tell Quiroz what to do, and Quiroz would follow those directions.

The Government attempts to cast Quiroz as a babysitter, relying on *United States v. Broaden,* 116 F.3d 1486, 1997 WL 345796 (9th Cir.1997) for support of its proposition that Quiroz had the authority to provide consent. In *Broaden,* the Ninth Circuit affirmed the district court's decision to deny defendant Broaden's motion to suppress. Broaden was arrested and prosecuted after officers conducted a search of his apartment, including a freezer, which yielded illegal narcotics (namely, PCP). *Id.* Broaden himself was not present during the search and, thus, did not consent to the search. Instead, the officers obtained consent from Broaden's fourteen year old daughter, Leatrice. Leatrice did not live with Broaden, but was babysitting Broaden's three other children when the officers arrived. Relying on *Matlock,* the Ninth Circuit pointed out that a third party's common authority or other sufficient relationship to the property searched may provide a sufficient basis for consent to a warrantless search. *Id.* The Court noted that Broaden "entrusted [Leatrice] with substantial responsibility over his children and his home," and, therefore, she had the authority to permit the search. *Id.* "By ceding control over the apartment and the kitchen to Leatrice, Broaden assumed the

risk that Leatrice would reveal the contents of the freezer to others." *Id.*

The Court is not convinced that Quiroz was the functional equivalent of a babysitter. The evidence does establish that Quiroz was the only adult present in the home with Christian when the agents approached the house. The evidence also established that Quiroz prepared dinner for Corral's children on occasion. Indeed, on the day of the search, she fed Christian at Carrillo's behest. Beyond this, however, nothing indicates that Quiroz performed any other duties relating to the supervision or oversight of Christian. The simple fact that Quiroz was present in the home at the same time as Christian does not establish that she acted as his babysitter or caretaker in Corral's absence. In fact, the evidence indicated that Christian's authority to do something, in the absence of his mother, came from his Aunt Gloria, and not from Quiroz.

Furthermore, any support provided by *Broaden* is limited at best. First, *Broaden* is an unpublished opinion with narrow and limited precedential value, even within the Ninth Circuit itself.[11] Second, the *Broaden* opinion contains only a brief discussion of the factual issues necessary for any inquiry into the validity of a third party's consent to a warrantless search. Although the Court found that Broaden ceded control to Leatrice, absent from the opinion is any detailed discussion of Leatrice's presence in Broaden's home (i.e., how long she had been there, where Broaden was located, or how often she watched his children). The Ninth Circuit

did not hold that any and every time a defendant entrusts a third party with some property that the defendant automatically assumes the risk of exposure or consent to a warrantless search. Rather, the Court affirmed the district court's finding that, based on the factual record and Leatrice's relationship to the premises, Broaden assumed the risk that Leatrice would let the officers into his apartment. The Court emphasized the language in *Matlock* stating that either common authority or another sufficient relationship to the property may justify a third party's consent to search. Based on the factual record before it, the Ninth Circuit was content in holding that Leatrice had a sufficient relationship to the premises to provide consent to search.

Ultimately, the Court must determine whether Quiroz's relationship to the property "on its own terms and conditions, amounted to a 'sufficient relationship to the premises' or 'joint access or control for most purposes.'" *Shelton,* 337 F.3d at 535 (citation omitted). Based on the facts before it, the Court does not believe that it is reasonable to conclude that Quiroz's limited access to or control over the premises supports a finding that she possessed actual authority to consent to a search. It would not, then, be reasonable to find that Corral assumed the risk that Quiroz would consent to a search of the premises. Quiroz did not exercise common authority over the premises and her relationship to the premises was tangential at best. The Sixth Circuit has stated that, if an employee's job duties include the granting of ac-

---

11. According to Ninth Circuit Rule 36–3, the Broaden opinion is not binding precedent and may not be cited to or by the courts of the Ninth Circuit except in narrow circumstances, namely when relevant "under the doctrines of law of the case, res judicata, and collateral estoppel." In comparison, Fifth Circuit Rule 47.5 addresses unpublished opin-

ions issued by the Fifth Circuit and provides that unpublished opinions issued by the Fifth Circuit after January 1, 1996 carry limited precedential value, but may be persuasive. The Ninth Circuit rule dealing with unpublished opinions does not include such a caveat.

cess to the premises, authority to consent is more likely to exist; for example, "[a] caretaker left in charge of a home for several weeks ... might have authority to permit entry, while a worker who is present on a more limited basis would not." *Jones*, 335 F.3d at 531 (citation omitted). Quiroz's presence at Corral's home was dictated by Corral and was far too limited and narrowly defined to support a finding of actual authority.

### 2. Did Quiroz Present Apparent Authority To Consent?

■■■■ Absent actual authority, warrantless searches can withstand the exclusionary rule and will be upheld if a third party conveys the apparent authority to consent to a search. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "To establish that a third party had *apparent* authority to consent ... the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent." *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir.1997) (citing *Rodriguez*, 497 U.S. at 188, 110 S.Ct. 2793 (emphasis added)). The "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 189, 110 S.Ct. 2793 (citing *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

Several Circuits have interpreted *Rodriguez* to stand for the proposition that the apparent authority doctrine only protects an officer's mistake of fact, and not a mistake of law, in concluding that a third party has authority to consent to a search. In *United States v. Whitfield*, the D.C. Circuit held that "*Rodriguez* thus applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be." 939 F.2d 1071, 1074 (D.C.Cir.1991).

■■■■ Significantly, the *Whitfield* Court stated that "under *Matlock* and *Rodriguez* agents faced with [ambiguous or unclear] situations must make further inquiries before engaging in warrantless searches. If the information gleaned from those inquiries is insufficient to establish apparent authority, the Fourth Amendment demands that the agents procure a warrant." *Id.* at 1075. Thus, agents cannot rely on the apparent authority doctrine to justify a warrantless search based on third party consent when they lack a sufficient factual basis to conclude that the third party had the authority to consent. "If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful *without further inquiry.*'" *Id.* at 1075 (emphasis added). Ninth and Tenth Circuit precedent also shows that the apparent authority doctrine only operates to protect an officer's reasonable mistake of fact. *See United States v. Dearing*, 9 F.3d 1428, 1429 (9th Cir.1993) (stating apparent authority doctrine requires that an officer believe "some untrue fact that was then used to assess the extent of the consent-giver's use of an access to or control over the area searched"); *United States v. Salinas–Cano*, 959 F.2d 861, 865 (10th Cir. 1992) (stating it is not enough that the officer testify that he thought the consenting party had joint access and control); *see also* 3 WAYNE R. LaFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 8.3 (3d ed.2002) (stating that "the fundamental point here is that the *Rodriguez* apparent authority doctrine applies to mistakes of fact but not mistakes of law").

Fifth Circuit case law does not appear to definitively hold that the apparent authority doctrine only insulates mistakes of fact. However, Fifth Circuit precedent does create this implication. In *United States v. Jaras*, defendants Salazar and Jaras were stopped by a traffic officer who suspected that Salazar was driving under the influence of some intoxicant. 86 F.3d 383 (5th Cir.1996). During the stop, the officer conducted a search of luggage that belonged to Jaras, even though Salazar clearly informed the officer that the suitcases belonged to Jaras and that Jaras never provided his consent to search. *Id.* at 386. The officer opened Jaras' luggage, located marijuana, and Jaras was arrested and prosecuted. Jaras moved to suppress, and the Fifth Circuit ultimately refused to find that Salazar had either actual or apparent authority to consent to the search. *Id.* at 389. In determining that Salazar did not have apparent authority, the Court noted that the officer "did not mistakenly rely on information that, if true, would have justified a belief that Salazar had actual authority to consent to a search of the luggage putatively belonging to Jaras." *Id.* Thus, the Court implied that the apparent authority doctrine requires that the officer or agent rely on some erroneous factual representation that, if true, would have properly been the basis for authority to consent to a search.

■ If the apparent authority doctrine requires that officers believe some erroneous fact or piece of information which, if true, would establish proper authority to consent, Carrillo and Wright's search of Corral's residence cannot not be upheld. Carrillo and Wright were not provided with any erroneous factual assertion which formed part of the basis for their conclusion that Quiroz had the authority to consent. For example, Quiroz never told them that she lived on the premises, a fact which, if true, would weigh heavily in finding that she had the authority to consent.

■ Prior to the agents entering Corral's home, Carrillo did ask Quiroz if she was "in charge" of Christian, to which Quiroz responded affirmatively. This representation, however, standing alone, is too vague to constitute an erroneous factual assertion on which the agents could rely to support a determination of apparent authority to consent to a search. The phrase "in charge" does not meaningfully define Quiroz's access or control over Corral's home such that a person of reasonable caution would believe she had the requisite authority to consent to a search of the premises when in fact she did not. Compounding the problem with reliance on Quiroz's response to Carrillo, the agents did not attempt to resolve the ambiguity inherent in Quiroz's response by obtaining additional information at the moment of Quiroz's purported consent.[12]

12. Law enforcement officers cannot be indifferent to known facts at the time they procure third party consent to a search and later contend they made a mistake of fact that led to a reasonable conclusion of apparent authority by the third party after it is shown that no finding of actual authority is justified. *See U.S. v. Davis*, 332 F.3d 1163, 1170 (9th Cir. 2003) (finding that officers' awareness of known facts obviated any possible mistake of fact in concluding that a third party had authority to consent to a search); *see also U.S. v. Basinski*, 226 F.3d 829, 835 (7th Cir.2000) (finding any possible reasonable belief by officers in the apparent authority of a third party was negated by other contemporaneous statements made by the third party). Here, the agents cannot say that there was a reasonable belief that Quiroz being "in charge" of Christian meant she possessed joint access to, or control of, the home for most purposes when additional representations were made that put the agents on notice that Quiroz was essentially a part-time maid. The circumstances should have led to further questions about Quiroz's precise duties and relationship to Corral *before* an entry into the house took

Therefore, the agents did not have sufficient information to validly make a judgment on whether Quiroz had the requisite authority to consent to the search. Since there was no mistake of fact in this context that could have amounted to an assertion of apparent authority over the premises that was relied on by the agents, the Court finds that the agents' actual judgment to that effect was unreasonable.

 Even assuming that the apparent authority doctrine does not require some erroneous factual belief, and that overall reasonableness is the sole inquiry, the Court still finds that Quiroz did not display the apparent authority to consent to the search. As the Supreme Court pointed out in *Rodriguez* the "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" 497 U.S. at 188, 110 S.Ct. 2793 (citation omitted (internal quotations omitted)). "If not, then warrantless entry without further inquiry is unlawful unless authority actually exists." *Id.* at 188–89, 110 S.Ct. 2793. Interpreting *Rodriguez,* the *Whitfield* Court stated that "[i]f the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful *without further inquiry.*'" *Whitfield,* 939 F.2d at 1075 (citations omitted) (emphasis in original).

Based on the facts provided to Carrillo and Wright at the outset, the Court concludes that the agents could not have reasonably believed that Quiroz had the authority to consent to a search of Corral's home. Before Quiroz consented to the search, Carillo ascertained only minimal information regarding Quiroz's presence at the residence. Quiroz informed the agents that she was the housekeeper, that she cleaned the whole house, and also indicated that she was the only adult present with Defendant's minor son, Christian. However, Quiroz also informed the agents that she neither owned nor lived on the premises. Additionally, the agents never inquired into Corral's whereabouts. Only after they entered the home did Quiroz indicate that Corral was at the store.

Thus, prior to entering the residence, Carrillo and Wright had no idea whether Corral would return momentarily, or whether she was expected to be absent for an extended period of time. The Court believes that Carrillo and Wright were presented with minimal facts that failed to establish that Quiroz could properly consent to a search. Prior to entering the home, they obtained only a broad and non-specific description of Quiroz's duties and presence. Had they inquired further, they may have elicited facts that would have caused them pause.

For example, they may have learned that Quiroz had only worked for Corral for about two months, that she did not have free access to the premises, and that Corral defined the range and scope of her duties. Instead, the agents based their conclusion that Quiroz could consent on vague answers to broad questions. In light of the facts adduced, the Court cannot conclude that, based on the facts presented to Carrillo and Wright prior to obtaining Quiroz's consent, a person of reasonable caution would conclude that Quiroz had the authority to permit the search.

---

place. Instead, follow up questions were not asked until well after the search commenced.

The follow up questioning is further discussed *infra.*

The Court by no means concludes that a maid or housekeeper or babysitter could never convey to agents an apparent authority to consent to a search. However, an agent or officer's belief that a third party has the apparent authority to permit a search must be based on some factual understanding that ultimately makes it reasonable to reach that conclusion. The fact that Quiroz was the housekeeper and may have watched over Christian while Defendant was out is not enough to support a belief that Quiroz had the apparent authority to consent. In short, with or without any mistake of fact, the agents had an insufficient factual basis upon which to support a belief that Quiroz could consent to a search of the house.

The Government relies on *United States v. Thomas* for its position that Quiroz displayed the apparent authority to consent to the search. 120 F.3d 564 (5th Cir.1997). In *Thomas,* four defendants were charged with various violations of the Controlled Substances Act and all four defendants moved to suppress evidence seized by police officers during a search of an apartment leased to Thomas himself. *Id.* at 567. The officers in question received a tip from a confidential informant that co-defendant Goins would be manufacturing crack cocaine, and the officers set up surveillance of the apartment based on this tip. *Id.* The officers observed co-defendant Harmon exit the apartment and drive away; the officers subsequently stopped Harmon for a traffic violation, arrested him, and found a loaded firearm on his person. *Id.* Thereafter, the officers witnessed Thomas leave the apartment, whom they arrested based on outstanding warrants. *Id.* Upon his arrest, Thomas provided the officers with conflicting information on whether he lived in the apartment. *Id.* Goins later exited the apartment and walked to a pay phone, where officers arrested him based on outstanding warrants. *Id.* at 568.

After arresting Harmon, Thomas, and Goins, the officers approached to obtain consent to search the residence. *Thomas,* 120 F.3d at 568. The officers entered the property through an open gate, approached the front door of the apartment, and knocked on the front door. *Id.* A voice inside the unit responded "come in," and one of the officers knocked again and identified himself as a police officer. *Id.* After a third knock, one of the occupants then opened the door and walked away, permitting the officers to see evidence of drug manufacturing inside the residence. *Id.* at 568, 572. The officers entered and soon determined that the individual who let them into the residence was mentally disabled and, therefore, not competent to provide consent to search the premises. *Id.* Another individual, co-defendant Jackson, was also present in the apartment, and the officers obtained consent from him. *Id.*

Jackson "told the officers he was left there to take care of the mentally impaired man." *Thomas,* 120 F.3d at 568. The officers asked him to consent to a search of the apartment, to which he replied, "you already in, you might as well search." *Id.* Defendants Thomas and Jackson moved to suppress the evidence seized from the officers' search, arguing that Jackson did not have the authority to consent to a search of the premises. *Id.* at 572. "The district court concluded that Jackson had apparent authority to consent to a search of the common areas of the apartment," but not " 'beyond those areas in which an individual who is there as a babysitter would have a right to access.' " *Id.* at 572. The district court apparently reached this conclusion after considering Jackson's duties. It then suppressed only the evidence that the officers located in non-common areas of the

apartment. *Id.* at 568. On appeal, the Fifth Circuit affirmed the district court stating, "[w]e agree that the officers reasonably relied on Jackson's apparent authority to consent to their search of the common areas of the apartment." *Id.*

 The district court in *Thomas* specifically noted that it was reasonable for the officers to believe that Jackson had the authority to consent to a search of the "common areas and the bedroom areas of the apartment, *the areas in which he testified he was permitted to use and was given free access to as a babysitter.*" *Thomas,* 120 F.3d at 572 (emphasis added). However, the Fifth Circuit did not describe the full extent of Jackson's duties and access in relation to the property. It is unclear what, exactly, Jackson was charged with doing that would justify the apparent authority to consent. The district court must have engaged in the prescribed fact-specific inquiry regarding Jackson's duties in order to reach the determination that he had the apparent authority to consent. *See Kaspar v. City of Hobbs,* 90 F.Supp.2d 1313, 1322–23 n. 10 (D.N.M.2000). However, the nature of Jackson's duties is not discussed in the opinion. *Id.* at 1323 n. 10. Thus, *Thomas* simply stands for the general principle that a person with joint access to and control over property can validly consent to a search, and that, *depending upon the factual circumstances,* a babysitter or caretaker may have the apparent authority to consent to a warrantless search. *See id.* at 1322 (discussing *Thomas* holding on this point).

This Court agrees that given the appropriate set of circumstances, a babysitter or caretaker may have the apparent authority to consent to a search. Based on the factual circumstances of this case, however, the Court finds that a "person of reasonable caution" could not conclude that Quiroz had the authority to consent to a search. The agents here failed to conduct the sufficient inquiry that could have provided them with a proper basis for assessing Quiroz's ability to provide consent.

## III. CONCLUSION

To summarize, upon being let into the courtyard area outside of Corral's home and conversing with Quiroz, the agents learned the following:

1) Quiroz did not own the home.

2) Quiroz did not live in the home, but was the only adult present.

3) Quiroz only cleaned the home, on a weekly basis, and washed clothes.

4) Quiroz was "in charge" of the boy, Christian.

Prior to entry, agents elicited no other details, nor was it ever determined what "in charge" meant.

After entry into the home and after Agent Riggin found black wrapped bundles of narcotics in the den, Carrillo continued to interrogate Quiroz. At this point, the agents learned the following:

1) The owner of the home, Corral, was merely at the store during the search.

2) Quiroz performed housekeeping duties for Corral, including "care" of the children, cooking, and laundry.

3) Quiroz cleaned the entire house.

4) Quiroz was not specifically prohibited from entering any particular part of the house.

5) After her laundry duties, Quiroz did not enter the various rooms of the house in order to put the laundry away.

While agents contemporaneously acquired this knowledge, and after contraband was found in the home, Agent Wright was sent to obtain a warrant to search the premises.

Even though the agents commenced an initial search of the home, engaged in further interrogation of Quiroz, undertook actions to obtain a search warrant, and performed an additional detailed search of the home, the following facts were, for some reason, not assessed through the agents' investigation:

1) Quiroz only worked for Corral for less than two months.
2) Quiroz only worked for Corral two days a week.
3) Quiroz only performed duties that Corral directed her to perform.
4) Christian's aunt, Gloria, and not Quiroz, was ultimately "in charge" of the boy.
5) Corral transported Quiroz to and from work at the home.
6) Quiroz did not have a key to the home.
7) Quiroz did not have free access to the home.

The Government urges the Court to consider the responses of Quiroz outside Corral's home as indicative of one who possessed control, and thus apparent authority, over the premises. The precise deficiency inherent in this argument is that the agents did not obtain enough information from Quiroz *prior to entry* to draw a reasonable conclusion concerning Quiroz's authority to consent to a search. Instead, the agents made a legal determination based on insufficient facts that Quiroz had authority to consent. Had they gathered additional facts in this instance, they might have reached the same or opposite conclusion. In any event, the agents' belief that Quiroz had authority to consent, based solely on answers given to Carrillo's questions in Corral's courtyard, was unreasonable.

Based on the above analysis of facts and legal principles, the Court concludes that Quiroz lacked either actual or apparent authority to consent to the search. Because Quiroz lacked the authority to provide such consent, Corral's Motion should be granted, and all evidence obtained as a result of Quiroz's consent to search should be suppressed.

Accordingly, **IT IS ORDERED** that Corral's Motion to Suppress is **GRANTED.** All evidence obtained as a result of Quiroz's consent to the search of the Jerry Abbott residence shall be, and is hereby, suppressed.